1 F.3d 1274
 303 U.S.App.D.C. 107, 62 USLW 2109
 Scott ARMSTRONG; Gary M. Stern; Eddie Becker; National
Security Archive; Center for National Security Studies,
American Historical Association and American Library
Association, Plaintiffs-Appellees,
v.
EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF ADMINISTRATION;
National Security Council; Trudy Peterson, Acting
Archivist of the United States; White House Communications
Agency, Defendants-Appellants.
Scott ARMSTRONG; Gary M. Stern; Eddie Becker; National
Security Archive; Center for National Security
Studies, Plaintiffs-Appellees,
v.
EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF ADMINISTRATION;
National Security Council; Trudy Peterson, Acting
Archivist of the United States; White House Communications
Agency, Defendants-Appellants. (Two Cases)
Scott ARMSTRONG; Gary M. Stern; Eddie Becker; National
Security Archive; Center for National Security Studies;
American Historical Association; American Library
Association, Plaintiffs-Appellants,
v.
EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF ADMINISTRATION;
National Security Council; Trudy Peterson, Acting
Archivist of the United States; White House Communications
Agency, Defendants-Appellees.
 Nos. 93-5002, 93-5048, 93-5156 and 93-5177.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 15, 1993.
Decided Aug. 13, 1993.
 
 [303 U.S.App.D.C. 110] Appeal from the United States District Court for the District of Columbia (Civil Action No. 89cv00142).
 Freddi Lipstein, Attorney, U.S. Dept. of Justice, Washington, DC, argued the cause for appellants-cross-appellees. With her on the joint brief were Stuart E. Schiffer, Acting Asst. Atty. Gen., J. Ramsey Johnson, U.S. Atty., Leonard Schaitman, Matthew M. Collette, and Patricia A. Millett, Attorneys, U.S. Dept. of Justice, Washington, DC.
 Michael E. Tankersley, Washington, DC, argued the cause for appellees-cross-appellants. With him on the joint brief were David C. Vladeck and Alan B. Morrison, Washington, DC. Patti Ann Goldman, Kate Abbott Martin and Katherine Anne Meyer, Washington, DC, entered appearances.
 Before MIKVA, Chief Judge; WALD and HENDERSON, Circuit Judges.
 Opinion for the Court filed PER CURIAM.[1]
 
 PER CURIAM:
 
 1
 This consolidated appeal presents us with important questions of federal agencies' statutory obligations to manage electronic records as well as issues related to the appropriate use of the civil contempt power to coerce conformity with district court orders.
 
 
 2
 In the flagship portion of the appeal, defendants-appellants--the Executive Office of the President ("EOP"), the Office of Administration, the National Security Council ("NSC"), the White House Communications Agency, and Trudy Peterson, Acting Archivist of the United States--challenge the district court's conclusion that EOP and NSC guidelines for managing electronic documents do not comport with Federal Records Act ("FRA" or the "Act") requirements. More specifically, these government agencies and officials contend that, contrary to the court's ruling, they have, in the past, reasonably discharged their FRA obligations by instructing employees to print out a paper version of any electronic communication that falls within the statutory definition of a "record" and by managing the "hard-copy" documents so produced in accordance with the Act. We reject the government's argument on this score. The government's basic position is flawed because the hard-copy print-outs that the agencies preserve may omit fundamental pieces of information which are an integral part of the original electronic records, such as the identity of the sender and/or recipient and the time of receipt.
 
 
 3
 The defendants also appeal the district court's order holding them in civil contempt of its prior order enjoining the Archivist to "take all necessary steps" to preserve federal records and requiring the defendant agencies not to remove, alter, or delete any information until the Archivist takes action to prevent the destruction of federal records. More specifically, they contest the district court's contempt citation grounded in the court's conclusions that (1) the defendant agencies failed to issue adequate recordkeeping instructions to employees in the four months after their former guidelines were held invalid and (2) the transfer of nearly 6,000 backup tapes to the Archivist "adversely affected" those tapes. Because the district court orders on which the contempt citation rests did not specify that the defendants had an affirmative duty to create new guidelines by a date certain, the district court abused its discretion in holding the defendants in contempt at least in part because of their failure to issue such guidelines within four months. We remand to allow the district court to determine whether, in light of the defendants' speeded-up attempts in recent months to assure preservation of the tapes, its second ground, the failure to preserve these tapes, by itself, justifies a contempt citation.
 
 
 4
 [303 U.S.App.D.C. 111] Finally, we are presented with a cross-appeal. The plaintiffs-cross-appellants--Scott Armstrong, the National Security Archive, and several other researchers and nonprofit organizations--take issue with the district court's conclusion that federal courts have no authority to review NSC and Office of Science & Technology Policy ("OSTP") guidelines differentiating federal records subject to the FRA from presidential records subject to the Presidential Records Act ("PRA"), 44 U.S.C. Sec. 2201 et seq. Contrary to the district court, we conclude that the PRA allows limited review to assure that guidelines defining presidential records do not improperly sweep in nonpresidential records. Accordingly, we remand to the district court to determine whether the relevant NSC and OSTP directives categorize nonpresidential records as subject to the PRA.
 
 I. BACKGROUND
 A. Statutory Framework
 
 5
 Federal agencies' records creation, management, and disposal duties are set out in a collection of statutes known collectively as the Federal Records Act. See 44 U.S.C. Secs. 2101 et seq., 2901 et seq., 3101 et seq., 3301 et seq. The FRA, Congress informs, is intended to assure, among other things, "[a]ccurate and complete documentation of the policies and transactions of the Federal Government," "[c]ontrol of the quantity and quality of records produced by the Federal Government," and "[j]udicious preservation and disposal of records." 44 U.S.C. Sec. 2902(1), (2), (5); see also Armstrong v. Bush, 924 F.2d 282, 292 (D.C.Cir.1991) ("Armstrong I ") (the FRA is intended to guarantee that agencies' records management programs "strike a balance 'between developing efficient and effective records management, and the substantive need for Federal records' ") (quoting S.REP. NO. 1326, 94th Cong., 2d Sess. 2 (1976)). To achieve those ends, the FRA burdens the heads of federal agencies with several obligations. Most basically, each agency head must "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities." 44 U.S.C. Sec. 3101. Moreover, under the Act, agency chiefs must also "establish and maintain an active, continuing program for ... economical and efficient [records] management," id. Sec. 3102, and "establish safeguards against the removal or loss of records [the agency head] determines to be necessary and required by regulations of the Archivist." Id. Sec. 3105; see also Armstrong I, 924 F.2d at 293 (noting that these provisions, as well as others, furnished "law to apply" under the Administrative Procedure Act ("APA"), see 5 U.S.C. Sec. 701(a)(2), and thus permitted judicial review of agency recordkeeping guidelines' conformity with the FRA).
 
 
 6
 Besides assigning specific duties to agency heads, the FRA prescribes the exclusive mechanism for disposal of federal records. See 44 U.S.C. Sec. 3314 (no records may be "alienated or destroyed" except in accordance with the FRA's provisions). For these purposes, "records" are defined as
 
 
 7
 all books, papers, maps, photographs, machine readable [i.e., electronic] materials, or other documentary materials, regardless of physical form or characteristics, made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency ... as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them. Library and museum material made or acquired and preserved solely for reference or exhibition purposes, extra copies of documents preserved only for convenience of reference, and stocks of publications and of processed documents are not included.
 
 
 8
 Id. Sec. 3301. If a document qualifies as a record, the FRA prohibits an agency from discarding it by fiat. See American Friends Service Committee v. Webster, 720 F.2d 29, 62 (D.C.Cir.1983) ("Congress did not intend to grant [the agency] ... a blank check for [303 U.S.App.D.C. 112] records disposal."). Instead, the FRA requires the agency to procure the approval of the Archivist before disposing of any record. Cf. id. at 63. Normally, that approval may be obtained in one of two ways. First, an agency may submit a schedule of records sought to be discarded to the Archivist, who will sign off on the records' destruction only if she concludes that they do not "have sufficient administrative, legal, research, or other value to warrant their continued preservation." 44 U.S.C. Sec. 3303a(a). Second, the agency may jettison certain common types of records pursuant to disposal schedules promulgated in advance by the Archivist (the disposal schedules are, of course, designed to take into account the FRA's goal of preserving documents of "administrative, legal, research, or other value"). Id. Sec. 3303a(d).
 
 
 9
 Under the FRA, the Archivist's duties are not limited to judging the suitability of records for disposal. In addition, the Archivist must "provide guidance and assistance to Federal agencies with respect to ensuring adequate and proper documentation of the policies and transactions of the Federal Government and ensuring proper records disposition," id. Sec. 2904(a), "promulgate standards, procedures, and guidelines with respect to records management," id. Sec. 2904(c)(1), and "conduct inspections or surveys of the records and the records management programs and practices within and between Federal agencies." Id. Sec. 2904(c)(7). The Archivist also plays a key role in the FRA's enforcement scheme. If she discovers that an FRA provision has been or is being breached, the Archivist must (1) inform the agency head of the violation and suggest corrections and (2) if ameliorative measures are not undertaken within a reasonable time, submit a written report to Congress and the President. Id. Sec. 2115(b). Also, should the Archivist become aware of any "actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of records in the custody of [an] agency," she must notify the agency head of the problem and assist the agency head in initiating an action through the Attorney General for the recovery of wrongfully removed records or for other legal redress. Id. Sec. 2905(a); see also id. Sec. 3106 (requiring agency heads to notify the Archivist of any unlawful destruction or removal of records and placing upon them an independent duty to seek legal action through the Attorney General to recover the records). If the agency head is recalcitrant in pursuing legal remedies, the Archivist herself is to (1) request the Attorney General to initiate action and (2) inform Congress that she has made that request. Id. Sec. 2905(a); see also Armstrong I, 924 F.2d at 295 (holding that "if the agency head or Archivist does nothing while an agency official destroys or removes records in contravention of agency guidelines and directives, private litigants may bring suit to require the agency head and Archivist to fulfill their statutory duty to notify Congress and ask the Attorney General to initiate legal action").
 
 
 10
 B. The NSC and EOP Electronic Communications Systems
 
 
 11
 Since the mid-1980s, the NSC and the EOP have utilized electronic communications systems to improve their operational efficiency.[2] These systems allow employees to create and share electronic appointment calendars as well as to transfer and edit word processing documents, but it is their electronic mail (or "e-mail") capacity that has racked up the most mileage. The 1,300 federal employees with access to the EOP and NSC electronic mail systems can, and apparently do, utilize them to relay lengthy substantive--even classified--"notes" that, in content, are often indistinguishable from letters or memoranda. But, in contrast to its paper cousin, e-mail can be delivered nearly instantaneously at any time of the day or week. And, in contrast to telephone conversations, e-mail automatically creates a complete record of the exact information users send and receive.
 
 
 12
 Other attributes of the EOP and NSC electronic mail systems are also relevant [303 U.S.App.D.C. 113] here. First, these systems give recipients the option of storing notes in their personal electronic "log." After receiving a message, a user may instruct the computer to delete the note; otherwise, it will be stored in her log for later use. Second, both the recipient and the author of a note can print out a "hard copy" of the electronic message containing essentially all the information displayed on the computer screen. That paper rendering will not, however, necessarily include all the information held in the computer memory as part of the electronic document. Directories, distribution lists, acknowledgements of receipts and similar materials do not appear on the computer screen--and thus are not reproduced when users print out the information that appears on the screen. Without this "non-screen" information, a later reader may not be able to glean from the hard copy such basic facts as who sent or received a particular message or when it was received. For example, if a note is sent to individuals on a distribution list already in the computer, the hard copy may well include only a generic reference to the distribution list (e.g., "List A"), not the names of the individuals on the list who received the document. Consequently, if only the hard copy is preserved in such situations, essential transmittal information relevant to a fuller understanding of the context and import of an electronic communication will simply vanish. A final relevant fact here is that the individual note logs are not the only electronic repositories for information on the e-mail system. The defendant agencies periodically create backup tapes--snapshots of all the material stored on these electronic communications systems at a given time--that can be used later for retrieval purposes.
 
 C. Procedural History
 
 13
 On January 19, 1989, the final day of the Reagan Presidency, the National Security Archive filed several Freedom of Information Act ("FOIA"), 5 U.S.C. Sec. 552, requests for all the material stored on the EOP and NSC electronic communications systems from their installation in the mid-1980s up to that time. Simultaneously, the plaintiffs filed this suit for a declaration that the electronic documents contained on the NSC and EOP electronic communications systems and back-up tapes were federal and presidential records and an injunction prohibiting those documents' destruction. After agreeing to preserve the electronic tapes, the defendants filed a motion in the district court for dismissal or, in the alternative, for summary judgment. After that motion was denied, see Armstrong v. Bush, 721 F.Supp. 343 (D.D.C.1989), this court, on interlocutory appeal, settled several threshold issues in the litigation. Specifically, we held that the plaintiffs had standing to assert these claims because they were within the zone of interests of the records management provisions of the PRA and the FRA, see Armstrong I, 924 F.2d at 287-88, but that the President was not an agency under the APA and that the PRA impliedly precluded judicial review of the President's record creation, management, and disposal decisions under that statute. See id. at 288-91. We said, however, that the plaintiffs could seek judicial review of (1) agency guidelines' conformity to the FRA and (2) the agency heads' and Archivist's discharge of their FRA-derived responsibility to take action to prevent destruction or removal of federal records. See id. at 291-96. We then remanded the case to allow for supplementation of the record as to the precise guidance--written and oral--that the defendant agencies had given employees. See id. at 296-97.
 
 
 14
 On remand, the parties developed an extensive record, including a Joint Statement of Facts (the "Joint Statement"), and, on January 6, 1993, the district court issued its ruling on all the FRA issues raised by the plaintiffs (the plaintiffs' FOIA claims remain undecided). See Armstrong v. Executive Office of the President, 810 F.Supp. 335 (D.D.C.1993). In that ruling, the district court first addressed whether the communications stored in these electronic communications systems constituted federal records. Because the FRA's definition of "records" includes material "regardless of physical form or characteristics," the court concluded that substantive communications otherwise meeting the definition of federal "records" that had been [303 U.S.App.D.C. 114] saved on the electronic mail came within the FRA's purview. See id. at 340-41.
 
 
 15
 The court then found that the defendants' current practices for electronic records management were deficient in two key respects. First, assuming arguendo that the defendant agencies unequivocally informed their staffs to print out all on-screen information of any electronic note that qualified as a federal record (an assumption that the plaintiffs have vigorously contested throughout this litigation), that instruction was not adequate to meet the FRA's requirements because the "electronic material ... [is] qualitatively different than a copy printed out in paper form." Id. at 341. The district court emphasized that unless employees also printed out the transmittal information stored in the computer but not appearing on screen, the hard copies preserved in the paper files would not necessarily contain all the important items retained in the electronic system. See id. ("A paper copy of the electronic material does not contain all of the information included in the electronic version."); see also Appellants' Brief at 22 ("[The defendant agencies] do not require that all information related to an electronic message be preserved, but only that information that is captured when the message screen is printed or incorporated into a written memorandum."). Specifically, data "regarding who has received the information and when the information was received" might well be omitted from the paper versions. 810 F.Supp. at 341; see also id. at 346-47 (discussing NSC guidance).
 
 
 16
 The court found a second flaw in the agencies' records management practices: they failed to provide for any supervision of agency employees' electronic recordkeeping practices. Noting that (1) the National Archives Records Management Handbook provided that only "records officers" should determine the status of FRA records and (2) the defendant agencies supervise staffers' management of paper, but not electronic, records, the court concluded that the defendants' failure to supervise employees' electronic recordkeeping was arbitrary and capricious. See id. at 343; see also id. at 347 (discussing NSC guidance).[3]
 
 
 17
 Finally, the district court refused to adjudicate plaintiffs' claim that the NSC guidelines did not adequately distinguish between federal and presidential records. The court found that our holding in Armstrong I precluded judicial review of any guideline affecting the status of a presidential record. See id. 810 F.Supp. at 347-48.
 
 
 18
 To implement its decision, the district court issued a multi-part declaratory and injunctive order. The order, as amended, first declared that the defendant agencies' current guidelines were arbitrary and capricious and contrary to law. See Amended Order, Armstrong v. Executive Office of the President, 810 F.Supp. 335 (D.D.C.1993). Second, it enjoined the Archivist to "seek the assistance of the Attorney General with notice to Congress, and take all necessary steps to preserve, without erasure, all electronic Federal Records generated at the defendant Agencies." Id. Finally, it enjoined all the defendants "from removing, deleting, or altering information on their electronic communications systems until such time as the Archivist takes action ... to prevent the destruction of federal records, including those records saved on backup tapes." Id. In response to an emergency motion by the defendants, this court stayed this last requirement to the extent of allowing the agencies to "remove, delete, or alter" information so long as it was preserved elsewhere in identical form. See Armstrong v. Executive Office of the President, No. 93-5002 (D.C.Cir. Jan. 15, 1993).
 
 
 19
 On May 21, 1993, on petition of the plaintiffs, the district court found the defendants in civil contempt. See Armstrong v. Executive Office of the President, 821 F.Supp. 761 (D.D.C.1993). First, it found that interim guidance issued by the defendants in the wake of the court's invalidation of their old guidelines was inadequate. Accordingly, the court reasoned, the defendants were in contempt for not substantially complying with its orders requiring the agencies to preserve all [303 U.S.App.D.C. 115] records. See id., at 766-768. Second, the court held that the conditions surrounding the January 19, 1993, inauguration-eve transfer of backup tapes from the White House to the National Archives, as well as the Archivist's subsequent failure to recopy Reagan-era backup tapes nearing the end of their natural lifespan, violated the court's orders requiring preservation of the tapes. This treatment of the backup tapes, including the failure to recopy deteriorating tapes, thus furnished an additional basis for the contempt citation. See id. at 768-771. The court then set out a list of specific acts that the defendants were required to undertake by June 21, 1993 to purge themselves of contempt; if the defendants failed to accomplish them, fines of $50,000 a day, to be doubled in subsequent weeks, would be imposed until the defendants cleansed themselves of their contempt. See Order, Armstrong v. Executive Office of the President, 821 F.Supp. 761 (D.D.C.1993).
 
 
 20
 Following oral argument on June 15, 1993, this court stayed the district court's contempt sanctions pending the outcome of this appeal. See Armstrong v. Executive Office of the President, No. 93-5002, et al. (D.C.Cir. June 15, 1993).
 
 
 21
 II. THE VALIDITY OF CURRENT NSC AND EOP GUIDELINES
 
 
 22
 A. The Instruction to Print "Hard-Copy" Paper Versions
 
 
 23
 We first address appellants' contention that the district court erred in finding that their pre-January-order instruction to print on-screen information from electronic federal records was inconsistent with the FRA.[4] This question implicates two parts of this case. First, if the agencies' policy of printing on-screen information did not result in "papering" all federal records material, then at least some federal records will be permanently lost or destroyed unless the electronic backup records, currently being retained pursuant to the district court's orders, are preserved. This circumstance alone creates the predicate for an order requiring the Archivist and the relevant agency heads to take the statutorily prescribed steps to prevent the destruction of those tapes.[5] Second, if this "print screen" policy--which was still in effect at the time the district court ruled in January--is inadequate under the FRA, then the district court appropriately issued a declaratory judgment invalidating its future use.
 
 
 24
 In proceeding to decision on this point, we adopt the district court's assumption, based on the appellants' submissions, that both the EOP and the NSC have consistently instructed employees, either orally or in writing, that when any electronic document meets the definition of a federal record, the employee should either print out the information that appears on her computer screen or incorporate that material into a written memorandum. See Appellants' Brief at 7-8; see also id. at 22 ("[The agencies] do not require that all information related to an electronic message be preserved, but only that information that is captured when the message screen is printed or incorporated into a written memorandum.").
 
 
 25
 Accepting appellants' factual predicate, however, does not lead us to their legal conclusion that such an approach satisfies the Act. Our analysis is a straightforward one. We begin with the apparently undisputed proposition that the EOP and NSC electronic communications systems can create, and have created, documents that constitute federal records under the FRA. The FRA contemplates that documents qualifying as records [303 U.S.App.D.C. 116] may be stripped of that status only if they are "extra copies of documents preserved only for convenience of reference." 44 U.S.C. Sec. 3301. Applied to this case, that means that the mere existence of the paper printouts does not affect the record status of the electronic materials unless the paper versions include all significant material contained in the electronic records. Otherwise, the two documents cannot accurately be termed "copies"--identical twins--but are, at most, "kissing cousins." Since the record shows that the two versions of the documents may frequently be only cousins--perhaps distant ones at that--the electronic documents retain their status as federal records after the creation of the paper print-outs, and all of the FRA obligations concerning the management and preservation of records still apply. See, e.g., id. Sec. 3105 (requiring agency heads to "establish safeguards against the removal or loss" of "records"); id. Sec. 3314 (stating that "records" may only be "alienated or destroyed" in accordance with FRA provisions, i.e., with the approval of the Archivist).
 
 
 26
 To qualify as a record under the FRA, a document must satisfy a two-pronged test. It must be (1) "made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business" and (2) "preserved or appropriate for preservation by that agency ... as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in [it]." Id. Sec. 3301. The appellants do not contest the fact that many, if not all, of the communications relayed over the electronic system satisfy the "public transaction" element of this test. At oral argument, the government appeared to acknowledge that the "preserved or appropriate for preservation" criterion was satisfied as well for some documents on the system.[6]
 
 
 27
 To the extent any question remains, we reject the appellants' argument, on brief, that agency heads have sweeping discretion to decide which documents are "appropriate for preservation" (since we reject this contention, we do not consider whether the disputed documents have also been "preserved"). The appellants have stipulated that the electronic communications systems "contain information on the organization, functions, policies, decisions, procedures, operations, and other activities" of the agencies. Joint Statement p 64. Such documents could only fail to qualify as records if, despite their content, the agency has the inherent discretion to consider them en masse as not "appropriate for preservation ... as evidence of [the government's] organization, functions, policies, decisions, procedures, operations or other activities," 44 U.S.C. Sec. 3301 (emphasis added), an odd proposition to assert in this case since the agency heads admit that they have never surveyed the contents of the electronic systems. See Joint Statement p 67 ("Neither the EOP nor the NSC ha[s] conducted any formal examination, inspection, or survey to determine the types of communications recorded on the system, or the amount of information on the organization, functions, policies, decisions, procedures or other activities of the EOP or NSC recorded in [electronic] files."); cf. American Friends, 720 F.2d at 65. In any case, while the agency undoubtedly does have some discretion to decide if a particular document satisfies the statutory definition of a record, see Armstrong I, 924 F.2d at 297 n. 14, the statute surely cannot be read to allow the agency by fiat to declare "inappropriate for preservation" an entire set of substantive e-mail documents generated by two administrations over a seven-year period.[7] Cf. American Friends, [303 U.S.App.D.C. 117] 720 F.2d at 41 ("Congress was certainly aware that agencies, left to themselves, have a built-in incentive to dispose of records relating to [their] 'mistakes'...."). Indeed, to conclude that agencies have broad discretion to exempt seven years of substantive documents from record status would flout our prior holding in Armstrong I that the FRA furnishes sufficient "law to apply" to permit judicial review of agency guidelines relating to the management of federal records. See Armstrong I, 924 F.2d at 293 (noting that the FRA contains a "detailed definition of the 'records' that agencies must preserve") (emphasis added); see also id. ("Although the FRA understandably leaves the details of records management to the discretion of individual agency heads, it does contain several specific requirements....").
 
 
 28
 Having established that the electronic communications systems contain preservable records, we turn finally to the question of whether the government has the discretion to convert only part of the electronic records to paper and then manage only the partial paper records in accordance with the FRA and the Archivist's regulations. The question answers itself. Only one FRA provision exists that would even arguably sanction a document, once denominated a federal record, shedding that appellation at a later point. That provision states that "extra copies of documents preserved only for convenience of reference" are not "records." 44 U.S.C. Sec. 3301. But it is too tight a fit for the government to shoehorn the electronic records at issue here into that exception. Even assuming, without of course deciding, that one set of parallel documents retained in a different records system in a different medium than another set may be classified as a "cop[y]" under the FRA and thus subject to unobstructed destruction, the electronic records would still not qualify as "full reproduction[s] or transcription[s]; imitation[s] of a prototype; ... duplicate[s]," WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 404 (2d ed. 1979), of the paper print-outs. This is because important information present in the e-mail system, such as who sent a document, who received it, and when that person received it, will not always appear on the computer screen and so will not be preserved on the paper print-out. See Joint Statement p 46 ("When printed on paper, a[n] [e-mail] note will not always identify the sender(s) and recipient(s) of a note by name. Instead, the sender(s) or recipient(s) may be identified only by (a) userid [i.e., user identification]; (b) nickname; or (c) the title given to a distribution list identifying several individuals. Identifying the names of the sender(s) or recipient(s) for such notes requires reference to the distribution lists or directories maintained only in electronic form.") (emphasis added; record citations omitted); see also id. at p 47 ("If requested, [the electronic communications system] will provide the sender of a note with a confirmation that it has been received, called an 'acknowledgement.' The acknowledgement records the date and time the addressee of the note opened his or her electronic mail. This information on the date and time the note is received does not appear on the paper copy of the note when it is printed-out.") (record citations omitted). Since employees had never been--at least until the time of the district court's January order--instructed to include these integral parts of the electronic record[8] [303 U.S.App.D.C. 118] in any paper print-out, there is no way we can conclude that the original electronic records are mere "extra copies" of the paper print-outs. Cf. National Archives and Records Administration, Managing Electronic Records 19 (1990) ("Most agencies have decided to meet their recordkeeping requirements for documents that are created using word processing or electronic mail or messaging by printing those documents in hard copy. The success of this approach depends upon a clear understanding by all employees of the obligation to print and file all record material.") (emphasis added).
 
 
 29
 Our refusal to agree with the government that electronic records are merely "extra copies" of the paper versions amounts to far more than judicial nitpicking. Without the missing information, the paper print-outs--akin to traditional memoranda with the "to" and "from" cut off and even the "received" stamp pruned away--are dismembered documents indeed.[9] Texts alone may be of quite limited utility to researchers and investigators studying the formulation and dissemination of significant policy initiatives at the highest reaches of our government. See 810 F.Supp. at 341 (noting that the omitted information may be "of tremendous historical value in demonstrating what agency personnel were involved in making a particular policy decision and what officials knew, and when they knew it"). The "[t]omorrow, and tomorrow, and tomorrow" of government will be allowed to "creep in [their] petty pace from day to day" without benefit of the "last syllable of recorded time." WILLIAM SHAKESPEARE, MACBETH, Act V, scene v, line 19. In our view, as well as the district judge's, the practice of retaining only the amputated paper print-outs is flatly inconsistent with Congress' evident concern with preserving a complete record of government activity for historical and other uses.[10] See 44 U.S.C. Sec. 2902(1) (listing first among Act's goals the "[a]ccurate and complete documentation of the policies and transactions of the Federal Government"); see also Armstrong I, 924 F.2d at 288 (noting the "expressed statutory goal of preserving records for historical purposes"); American Friends, 720 F.2d at 57 (describing the FRA's legislative history as demonstrating that "Congress intended, expected, and positively desired private researchers ... to have access to the documentary history of the federal government"); cf. 36 C.F.R. Sec. 1222.38 ("Agency recordkeeping requirements shall prescribe the creation and maintenance of records of the transaction of agency business that are sufficient to: ... (e) Document the formulation and execution of basic policies and decisions and the taking of necessary actions, including all significant decisions and commitments reached orally (person to person, by telecommunications, or in conference)."). Perhaps that is why, in this court, the appellants seem to have abandoned their former heavy reliance on this theory.
 
 
 30
 Before us they plead an alternative, related, but no more compelling theory of statutory compliance: "that the extra information that plaintiffs argue must be preserved is in fact not always 'appropriate for preservation' as evidence of an agency's essential transactions, and that printing the actual message text on the computer screen normally is sufficient for adequate documentation of the agency's business. Since the printed copy is identical to what is on the computer screen, the electronic version of the message that remains is a copy that is nonrecord within the meaning of the statute." Reply Brief for Appellants at 9. In other words, the appellants contend that given the broad discretion [303 U.S.App.D.C. 119] vested in the agencies by the FRA, they may reasonably determine that some parts of a record document--the so-called "extra information"--are not "appropriate for preservation"; thus, after the creation of the paper records, the electronic version is a "copy" because the paper record contains all the material worth preserving from the electronic files.
 
 
 31
 This appeal to discretion, however, relies in the main on snippets of language from different parts of the FRA pasted together in ways incompatible with the overall design of the Act. As noted above, the "appropriate for preservation" phrase in the definition of "records" at most allows the agency some discretion in deciding whether a document meets that definition in the first place. See 44 U.S.C. Sec. 3301 (providing that federal "records" must be, inter alia, "preserved or appropriate for preservation by that agency ... as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them"). It does not, as appellants imply, grant agencies the discretion to automatically lop off a predesignated part of a whole series of documents that qualify as records (nor would it allow the wholesale destruction of the directories and similar materials if they were perceived to be independent records, see supra note 8). In substance, the appellants are claiming that it satisfies the Act to preserve a second version of a record that is an approximation of the first version if it includes all the material that, in their view, is "appropriate for preservation." Even if this argument made sense with respect to a particular document, it cannot be accepted across the board for seven years of records documenting high-level government decisionmaking. Further, as our discussion above makes clear, it cannot be squared with the FRA's "extra copies" provision. The Act explicitly provides an "out" of the system for a federal record only when a second version is identical to--i.e., an "extra copy" of--the first. There is no provision accepting abbreviated or summary versions of the original as the only record if the summary contains all material deemed "appropriate for preservation."[11]
 
 
 32
 Equally unconvincing is the appellants' suggestion that Congress' directive to preserve "adequate documentation" of agencies' "essential transactions" justifies their practice of retaining only the "substantive information" displayed on the computer screen. The phrases "adequate documentation" and "essential transactions" are lifted from 44 U.S.C. Sec. 3101, which states: "The head of each Federal agency shall make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities." The purpose of this provision, by its own terms, is to place a general obligation on agency leaders to create and then retain a baseline inventory of "essential" records. See American Friends, 720 F.2d at 54; see also id. at 56 (summarizing legislative history of this provision and concluding that it provided an enforceable "across-the-board requirement" that agencies retain certain types of records); S.REP. No. 2140, 81st Cong., 2d Sess. 15 (1950) (this provision "provides a general declaration by the Congress [to maintain adequate records]"). Other parts of the FRA, however, go on to prescribe more particularized duties for agency heads that reach beyond their general obligation to "adequately document" core agency functions. In particular, the Act includes (1) a separate definition of the term "records" that the appellants acknowledge sweeps in many of the electronic communications at issue here--whether or not preservation of those documents is necessary to maintain "adequate documentation" of "essential transactions"--and (2) other statutory provisions that mandate that all records--again, whether or not related to "adequate documentation" of "essential transactions"--be managed and retained in accordance with [303 U.S.App.D.C. 120] explicit statutory directives. See 44 U.S.C. Sec. 3314 ("[R]ecords ... may not be alienated or destroyed except under this chapter.") (emphasis added); see also id. Sec. 3105 (agency heads must "establish safeguards against the removal or loss of records ") (emphasis added). In sum, appellants' arguments fail to detour us from the analytical path we started down and now come close to finishing: (1) substantive e-mail communications satisfy the FRA definition of "records"; (2) the lone FRA provision for terminating their status as such requires that they be merely "extra copies" of other documents preserved elsewhere; and (3) since there are often fundamental and meaningful differences in content between the paper and electronic versions of these documents, the electronic versions do not lose their status as records and must be managed and preserved in accordance with the FRA.
 
 
 33
 Contrary to appellants' assertions, the conclusion that agencies must retain and manage these electronic documents in no way collides with Congress' oft-expressed intent to balance complete documentation with efficient, streamlined recordkeeping. See, e.g., S.REP. No. 2140, 81st Cong., 2d Sess. 4 (1950) ("It is well to emphasize that records come into existence, or should do so, not in order to ... satisfy the archival needs of this and future generations, but first of all to serve the administrative and executive purposes of the organization that creates them."). Our decision does not require that agencies, in appellants' words, save "every scrap of paper" they create. Not all scribbles and off-the-cuff comments will qualify as federal records. Nor do we saddle agencies with any new obligations to make additional documents in order to satisfy the needs of researchers or investigators. Cf. Armstrong I, 924 F.2d at 288 ("[P]laintiffs do not seek the creation of any new records, but rather ask only that the records already created be appropriately classified and disposed of...."); S.REP. No. 1326, 94th Cong., 2d Sess. 8 (1976), 1976 U.S.C.C.A.N. 6150, 6157 (emphasizing the need for economy in records creation because that is where 80% of total recordkeeping costs are incurred). Finally, our decision leaves undisturbed the agencies' ability to purge incidental electronic records from their files by acting, with the Archivist's approval, to dispose of those documents that lack "sufficient administrative, legal, research, or other value to warrant their continued preservation." 44 U.S.C. Sec. 3303a(a); see also 55 Fed.Reg. 19,216, 19,216 (1990) (Archivist notes that the burden of managing electronic records "can be reduced significantly by promptly scheduling all electronic records, thus limiting the application of [regulatory] requirements to the very small percentage of records that are scheduled as permanent").
 
 
 34
 In sum, we find that the district court was fully justified in concluding that appellants' recordkeeping guidance was not in conformity with the Act.
 
 
 35
 B. Supervision of Electronic Recordkeeping Practices
 
 
 36
 Appellants also dispute the district court's finding that their records management practices were arbitrary and capricious in failing to provide for supervision or auditing of employees' electronic recordkeeping practices by knowledgeable records management personnel. Specifically, appellants contend that they reasonably discharged their obligation to "safeguard" federal records by assigning records managers the task of providing oral and written guidance to agency personnel and making those recordkeeping experts available for resolution of specific problems.
 
 
 37
 The FRA explicitly requires each agency head to establish such safeguards against the removal or loss of federal records as she "determines to be necessary and required by regulations of the Archivist." 44 U.S.C. Sec. 3105; see also 36 C.F.R. Sec. 1220.2 ("Federal agency records management programs must be in compliance with regulations promulgated by [the Archivist]."). In this case, the agency heads clearly failed to discharge this obligation.
 
 The Archivist's regulations provide:
 
 38
 The head of each Federal agency shall ensure that the management of electronic records incorporates the following elements: ...[303 U.S.App.D.C. 121] (l ) Reviewing electronic records systems periodically for conformance to established agency procedures, standards, and policies.... The review should determine if the records have been properly identified and described, and whether the schedule descriptions and retention periods reflect the current informational content and use....
 
 
 39
 Id. Sec. 1234.10 (emphasis added). The Archivist has defined an "electronic records system" as "any information system that produces, manipulates, or stores Federal records by using a computer." Id. Sec. 1234.2 (emphasis added). As previously discussed, the electronic communication systems used by the EOP and the NSC do produce federal records, and it follows that agencies have an obligation under the Archivist's guidelines to undertake periodic reviews to assure that "established agency procedures, standards, and policies," including instructions as to what constitutes a record, are being adhered to. Moreover, the relevant regulations make clear that they apply to all electronic systems used by agency employees to create electronic records, not just, as appellants suggest, to "official" agency electronic records systems. See id. Sec. 1234.1 ("Unless otherwise noted, [this section's] requirements apply to all electronic records systems, whether on microcomputers, minicomputers, or mainframe computers, regardless of storage media, in network or stand-alone configurations."); cf. id. Sec. 1234.22 (listing specific requirements for electronic records systems "that maintain the official file copy of text documents on electronic media"). Moreover, to the extent there is any residual doubt on this question, we think that the agencies' own action in undertaking some review of employees' paper records before those employees exit government service and the common sense insight that an adequate program for ensuring records preservation must include some ongoing inspections and evaluations tip the balance against the government and lead to the conclusion that oversight is necessary as part of "an agencywide program for the management of all records created, received, maintained, used or stored on electronic media." Id. Sec. 1234.10(a).
 
 
 40
 On that basis, we affirm the district court's holding that the defendant agencies must undertake some periodic review of their employees' electronic recordkeeping practices.[12]
 
 
 41
 III. THE DISTRICT COURT'S CIVIL CONTEMPT ORDER
 
 
 42
 Next, the appellants appeal from the district court's May 21, 1993 civil contempt order. The district court found the appellants "in contempt of this Court's Orders of January 6 and 11, 1993, and the Order of the United States Court of Appeals for the District of Columbia dated January 15, 1993" in two respects: (1) "for failing to promulgate new, appropriate, and proper recordkeeping regulations for electronic federal records to replace those regulations struck down by this Court on January 6, 1993" and (2) "because the transfer of 5,839 tapes from the Defendant agencies to the Archivist has adversely affected the condition of the tapes and the information stored therein" which was "contrary to this Court's Orders to preserve the tapes and federal records contained on [303 U.S.App.D.C. 122] them." Order, Armstrong v. Executive Office of the President, 821 F.Supp. 761 (D.D.C.1993). The court further ordered that, unless the appellants should "purge themselves of this finding of contempt" by "tak[ing] appropriate action by 4:00 p.m. on June 21, 1993," they would be subject to a fine of $50,000 for each day of noncompliance during the first week, to be doubled to $100,000 per day the second week and $200,000 per day the third week, "with increases in such sanctions reserved thereafter for any further noncompliance with Court Orders." Id. at 2-3. The appellants assert that the contempt finding must be reversed because, inter alia, the district court's first ground, the failure to promulgate new regulations, was not a violation of the cited orders and therefore cannot support civil contempt. "The standard of review on an appeal from a finding of contempt is whether the District Court abused its discretion." International Ass'n of Machinists & Aerospace Workers v. Eastern Airlines, Inc., 849 F.2d 1481, 1486 (D.C.Cir.1988). We agree with the appellants that the contempt finding, as articulated, was an abuse of discretion because it rests in part on an impermissible ground.
 
 
 43
 As a preliminary matter, we reject the appellees' jurisdictional argument that the May 21, 1993 order is not an appealable one because it "imposes only a conditional sanction for failure to comply with a preexisting order." See Appellees' Contempt Brief at 13. As both the Eleventh Circuit and the Second Circuit have concluded, " 'Being placed under the threat of future sanction is a present sanction' " and an order so threatening " 'imposes a present remedy and hence is appealable.' " United States v. O'Rourke, 943 F.2d 180, 186 (2d Cir.1991) (quoting Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc., 793 F.2d 1529, 1533 n. 2 (11th Cir.1986)) (emphasis in original). We agree and therefore proceed to the merits of the contempt appeal.
 
 
 44
 "There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966). Nevertheless, "civil contempt will lie only if the putative contemnor has violated an order that is clear and unambiguous," Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 16 (1st Cir.1991), and the violation must be proved by "clear and convincing" evidence. Washington-Baltimore Newspaper Guild, Local 35 v. Washington Post Co., 626 F.2d 1029, 1031 (D.C.Cir.1980). The district court's first ground for its contempt finding, however, did not involve violation of any court order. The district court's January 11, 1993 order did not expressly direct the appellants to promulgate new regulations, but merely issued "a Declaratory Judgment that the guidelines issued by and at the direction of the Defendant Agencies are inadequate and not reasonable and are arbitrary and capricious and contrary to law in that they permit the destruction of records contrary to the Federal Records Act." Amended Order, Armstrong v. Bush, 810 F.Supp. 335 (D.D.C.1993). As the Supreme Court has observed: "[E]ven though a declaratory judgment has 'the force and effect of a final judgment,' 28 U.S.C. Sec. 2201, it is a much milder form of relief than an injunction. Though it may be persuasive, it is not ultimately coercive; noncompliance with it may be inappropriate, but is not contempt." Steffel v. Thompson, 415 U.S. 452, 471, 94 S.Ct. 1209, 1221, 39 L.Ed.2d 505 (1974) (quoting Perez v. Ledesma, 401 U.S. 82, 125-26, 91 S.Ct. 674, 697, 27 L.Ed.2d 701 (1971) (Brennan, J., concurring)). Thus, because the appellants were never directly ordered to promulgate new regulations, we must reverse the district court's contempt finding which was based in part on their failure to do so. Cf. Spallone v. United States, 493 U.S. 265, 276-77, 110 S.Ct. 625, 632-33, 107 L.Ed.2d 644 (1990) (reversing contempt finding against individual city councilmembers for city's violation of consent decree where "the individual city councilmembers ... were not parties to the action" and "although the injunctive portion of that decree was directed not only to the city but to 'its officers, agents, employees, successors and all persons in active concert with any of them,' ... the remaining parts of the decree ordering affirmative steps were directed only to the city"); International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76, 88 S.Ct. 201, [303 U.S.App.D.C. 123] 208, 19 L.Ed.2d 236 (1967) (reversing opinion upholding contempt finding for violating order that "did not state in 'specific ... terms' the acts that it required or prohibited") (quoting FED.R.CIV.P. 65(d)). Accordingly, we vacate the contempt order and remand to the district court to consider whether its second ground, the failure to preserve the tapes, by itself, justifies a finding of contempt, taking into account all efforts that have or will then have been made to assure the tapes' integrity.[13]
 
 
 45
 IV. REVIEWABILITY OF EOP AND NSC GUIDELINES DEFINING
 
 PRESIDENTIAL RECORDS
 
 46
 Finally, the plaintiffs-appellees cross-appeal the district court's conclusion that it did not have jurisdiction to review the EOP recordkeeping guidelines regarding presidential records. As cross-appellants, they assert that the guidelines improperly instruct NSC and OSTP staff to treat as presidential records materials that are, in fact, agency records subject to the FRA. We have jurisdiction to hear the cross-appeal under 28 U.S.C. Sec. 1292(b) because it challenges aspects of the same interlocutory order that is the subject of the main appeal. See Armstrong I, 924 F.2d at 296 n. 13.
 
 
 47
 The district court erred in declining to review the EOP guidelines defining presidential records. The PRA delineates those records over which the President may exercise "virtually complete control" during his term of office, id. at 290, and the courts may not restrict that control by reviewing the President's recordkeeping practices and decisions. Id. at 291. But the courts are accorded the power to review guidelines outlining what is, and what is not, a "presidential record" under the terms of the PRA. The PRA does not bestow on the President the power to assert sweeping authority over whatever materials he chooses to designate as presidential records without any possibility of judicial review. Rather, it provides that all materials that were subject to the FOIA, 5 U.S.C. Sec. 552, prior to the passage of the PRA remain subject to the FOIA and do not qualify as "presidential records." Thus, the court may review the EOP guidelines for the limited purpose of ensuring that they do not encompass within their operational definition of presidential records materials properly subject to the FOIA. We therefore reverse and remand to the district court for proceedings consistent with this opinion.
 
 A. Background
 
 48
 The FRA and the PRA apply to distinct categories of documentary materials. As restated more fully, supra pages 1278-79, the FRA defines the "records" subject to the Act as all
 
 
 49
 documentary materials ... made or received by an agency of the United States Government under federal law or in connection with the transaction of public business and preserved or appropriate for preservation ... as evidence of the ... activities of the Government or because of the informational value of data in them.
 
 
 50
 44 U.S.C. Sec. 3301. ("Records" subject to the FRA are referred to hereinafter as "federal records.") The PRA defines "presidential records" as
 
 
 51
 documentary materials ... created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.
 
 
 52
 44 U.S.C. Sec. 2201(2). The definition goes on to exclude specifically "any documentary materials that are ... official records of an agency," as the term "agency" is defined in the FOIA, 5 U.S.C. Sec. 552(f). Id. Sec. 2201(2)(B)(i).
 
 
 53
 Whereas federal records are subject to a strict document management regime [303 U.S.App.D.C. 124] supervised by the Archivist, see supra pages 1278-79, the PRA "accords the President virtually complete control over his records during his term of office." Armstrong I, 924 F.2d at 290. Neither the Archivist nor an agency head can initiate any action through the Attorney General to effect recovery or ensure preservation of presidential records. Compare 44 U.S.C. Sec. 3106 (requiring agency heads to notify the Archivist of unlawful removal or destruction of federal records and to seek legal action through the Attorney General to recover or preserve the records); id. Sec. 2905(a) (directing the Archivist to assist the agency head in initiating an action through the Attorney General for the recovery of wrongfully removed federal records or for other legal redress, and requiring the Archivist to make her own request to the Attorney General if the agency head is recalcitrant). Furthermore, the President may designate a period, not to exceed twelve years after the completion of his presidency, during which his presidential records shall not be accessible under the FOIA or otherwise. Id. Sec. 2204.
 
 
 54
 The Archivist can request congressional advice regarding the President's intention to dispose of presidential records if the Archivist believes that the records may be of special interest to Congress or that consultation is in the public interest, 44 U.S.C. Sec. 2203(e), and she can also cause the President to submit a disposal schedule at least 60 calendar days of continuous session of Congress in advance of the proposed disposal date. Id. Sec. 2203(d). But "neither the Archivist nor the Congress has the authority to veto the President's disposal decision." Armstrong I, 924 F.2d at 290 (citation omitted).
 
 
 55
 The EOP guidelines in question classify broad categories of NSC records as federal records, but also provide that NSC records "are [p]residential records if they were received or created for the President, the [National Security Adviser] ... or his Deputy, or a member of the White House staff independently of any meeting or policy and staff actions of the NSC or its various groups." Joint Statement p 157(c). The analogous guidelines for the OSTP provide that OSTP records are federal records, but "records produced or received by the Director of OSTP in his role as Science Advisor to the President are [p]residential records and should be segregated as such." Id. p 157(d).
 
 
 56
 Relying in large part on our decision in Armstrong I, the district court held that "the NSC is entitled to segregate presidential and federal records.... [T]his Court has no power to review actions taken by the President to ensure that presidential records are maintained." Armstrong, 810 F.Supp. at 347, 348 (citations omitted). The district court also stated that our decision in Armstrong I
 
 
 57
 provided the methodology for separating the FRA and the PRA as it applies here: ... EOP components whose sole responsibility is to advise the President are subject to the PRA and create presidential records. Similarly, the components of the EOP that have statutory responsibility are subject to the FRA.
 
 
 58
 Id. 810 F.Supp. at 349 (citing Armstrong I, 924 F.2d at 286 n. 2). The district court further understood Armstrong I to have found that the NSC advises the President and has statutory obligations, and to have applied the foregoing "methodology" to determine that the NSC "produces both presidential and federal records." Id. 810 F.Supp. at 347-48 (citing Armstrong I, 924 F.2d at 286 n. 2).
 
 
 59
 In light of its interpretation of Armstrong I, the district court concluded that its order to take all necessary steps to preserve electronic federal records applied only to those agencies
 
 
 60
 that have statutory responsibility and not those that solely advise the President.... The Defendants shall not be required to preserve material[s] which are presidential records produced by components whose sole responsibility is to advise the President. However, in components that produce both types of records, this Court does have the jurisdiction to authorize the preservation of these materials until the Archivist can ensure that federal records are not destroyed.
 
 
 61
 Id. 810 F.Supp. at 349. Thus, although the district court concluded that it could not review [303 U.S.App.D.C. 125] the presidential records guidelines, it nonetheless ordered the NSC--and other EOP components who do not have the sole responsibility of advising the President--to preserve all records, both federal and presidential, "until the Archivist can ensure that federal records are not destroyed." Id.
 
 B. Reviewability of the Guidelines
 
 62
 As we have already stated, supra page 1290, the PRA defines "presidential records" as
 
 
 63
 documentary materials ... created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.
 
 
 64
 44 U.S.C. Sec. 2201(2). In addition, Congress explicitly provided that presidential records do not include "any documentary materials that are ... official records of an agency," as the term "agency" is defined in the FOIA, 5 U.S.C. Sec. 552(f). 44 U.S.C. Sec. 2201(2)(B)(i). The legislative history explains this limitation on the definition of "presidential records" as follows:
 
 
 65
 The term "presidential records" is intended ... to encompass all White House and [EOP] records ... which ... fall outside the scope of the FOIA because they are not agency records. In other words, that which is now subject to FOIA would remain so and that which is [not] now subject to FOIA would be subject to the [PRA,] including those provisions of the [PRA] which in specified circumstances specially apply FOIA to these non-agency records after a President leaves office.
 
 
 66
 H.R.REP. No. 1487, 95th Cong., 2d Sess. 11 (1978), 1978 U.S.C.C.A.N. 5732, 5742; see also id. at 3.
 
 
 67
 Thus, Congress perceived the potential definitional overlap between agency records under the FOIA and presidential records under the PRA, and explicitly provided that the PRA would apply only to records that "fall outside the scope of FOIA because they are not agency records." Put another way, the PRA provides that the definition of "agency" records in the FOIA trumps the definition of "presidential records" in the PRA. Congress was "keenly aware of the separation of powers concerns that were implicated by legislation regulating the conduct of the President's daily operations," and thus sought "to minimize outside interference with the day-to-day operations of the President and his closest advisors and to ensure executive branch control over presidential records during the President's term of office." Armstrong I, 924 F.2d at 290. At the same time, however, Congress sought to provide a clear limitation on just which materials the President could legitimately assert control over and to preserve the pre-existing body of FOIA law governing the disclosure of government agency records.
 
 
 68
 The PRA exclusion of records subject to the FOIA from the class of materials that may be treated as presidential records averts a clash in the role of judicial review under the two statutory schemes. Judicial review plays an indispensable role in ensuring proper government disclosure under the FOIA. 5 U.S.C. Sec. 552(a)(4)(B); Truitt v. Department of State, 897 F.2d 540, 547 (D.C.Cir.1990); Senate of Puerto Rico v. U.S. Department of Justice, 823 F.2d 574, 587 (D.C.Cir.1987); McGehee v. Casey, 718 F.2d 1137, 1148 (D.C.Cir.1983); Ray v. Turner, 587 F.2d 1187, 1190-95 (D.C.Cir.1978). At the same time, judicial review of the President's management of admittedly presidential records is impliedly precluded by the PRA. Armstrong I, 924 F.2d at 289; see infra pages 1293-94. Congress preserved the critical role of judicial review under the FOIA, and avoided a conflict between the PRA and the FOIA, by explicitly exempting records subject to the FOIA from the scope of the PRA and allowing judicial review of guidelines defining presidential records under the rubric of substantive FOIA law.
 
 
 69
 This narrow, clearly defined limitation on the scope of the PRA is absolutely essential to preventing the PRA from becoming a potential presidential carte blanche to shield materials from the reach of the FOIA. Of [303 U.S.App.D.C. 126] course, we presume that executive officials will act in good faith. But if guidelines that purport to implement the PRA were not reviewable for compliance with the statute's definition of presidential records, non-presidential materials that would otherwise be immediately subject to the FOIA would be shielded from its provisions, whether wittingly or unwittingly, if they were managed as presidential records. See44 U.S.C. Sec. 2204(a), (b) (President may designate a period, not to exceed twelve years after the completion of his presidency, during which his presidential records shall not be accessible under the FOIA or otherwise); id. Sec. 2204(c)(1) (presidential records shall be administered under the FOIA after the expiration of any limitations on access imposed under subsections 2204(a) and (b)). Moreover, in light of the fact that disposal decisions under the PRA are unreviewable, Armstrong I, 924 F.2d at 290, a non-presidential document subject to the FOIA could be forever removed from that statute's provisions if it were improperly classified as a presidential record and destroyed.
 
 
 70
 For example, imagine a guideline defining "presidential records" as "all records produced or received by, or in the possession or under the control of, any government agency or employee of the United States." This definition would sweep all, or virtually all, federal records--and many documentary materials that are neither federal nor presidential records--within the ambit of the PRA, and outside the scope of the FOIA. Reading the PRA to forbid judicial review of such a guideline for conformity with the PRA definition of presidential records would be tantamount to allowing the PRA to functionally render the FOIA a nullity. As we have already stated, supra pages 1292-93, Congress avoided this problem by excluding records subject to the FOIA from the scope of the PRA, thereby preserving FOIA law intact and maintaining the integral role of judicial review.
 
 
 71
 Our holding today is also consonant with the relationship between the FRA and the PRA. The FRA defines a class of materials that are federal records subject to its provisions, and the PRA describes another, mutually exclusive set of materials that are subject to a different and less rigorous regime. In other words, no individual record can be subject to both statutes because their provisions are inconsistent. If guidelines that purport to define presidential records were not reviewable, the cross-appellees could effectively shield all federal records not only from the FOIA, but also from the provisions of the FRA--thus evading this court's holding in Armstrong I, 924 F.2d at 293, that the courts have jurisdiction to decide whether the NSC's recordkeeping guidelines adequately describe the material subject to the FRA.
 
 
 72
 We held in Armstrong I that "the PRA precludes review of the President's recordkeeping practices and decisions." Armstrong I, 924 F.2d at 289. The cross-appellees urge the court to give this language the broadest possible reading, holding in effect that we may not review any guidelines that purport to implement the PRA or deal with asserted presidential records. Thus, argue the cross-appellees, the district court correctly held that the guidelines for determining which materials are presidential records are not subject to judicial review. We disagree. The Armstrong I opinion does not stand for the unequivocal proposition that all decisions made pursuant to the PRA are immune from judicial review.
 
 
 73
 The Armstrong I opinion addressed the question whether the courts could review the decision to erase materials designated by the government as presidential records within the meaning of the PRA. See id. at 284, 291. We held that judicial review was not available to monitor disposal and emphasized that Congress drafted the PRA in a manner that would "ensure executive branch control over presidential records during the President's term of office." Id. at 290 (emphasis added). Thus, we held that those decisions that involve materials that are truly presidential records are immune from judicial review. We did not hold in Armstrong I that the President could designate any material he wishes as presidential records, and thereby exercise "virtually complete control" over it, id. at 290, notwithstanding the fact that the [303 U.S.App.D.C. 127] material does not meet the definition of "presidential records" in the PRA.
 
 
 74
 The cross-appellees point to individual phrases and sentences in our Armstrong I opinion which they contend dictate the broad result they urge upon this court. However, as we have just said, this language must be read in the context of the issue before the court in Armstrong I. In any case, the language seized upon by the cross-appellees is entirely consistent with the result we reach today. We stated in Armstrong I that the PRA "require[s] the President to maintain records documenting the policies, activities, and decisions of his administration, but leav[es] the implementation of such a requirement in the President's hands." Id. However, the discussion that immediately follows this statement makes clear that the Armstrong I court was not addressing the initial classification of existing materials. The Armstrong I court discusses only the "creation, management, and disposal decisions" described in the provisions of 44 U.S.C. Sec. 2203. See id. at 290, 291. None of these decisions encompasses the initial classification of materials as presidential records.
 
 
 75
 A "creation" decision refers to the determination to make a record documenting presidential activities. See 44 U.S.C. Sec. 2203(a). Thus, the courts may not review any decisions regarding whether to create a documentary presidential record. "Management decisions" describes the day-to-day process by which presidential records are maintained. See id. Sec. 2204(a), (b). The courts may likewise not review these particulars of the presidential records management system. Armstrong I, 924 F.2d at 290. Finally, "disposal decisions" describes the process outlined in 44 U.S.C. Sec. 2203(c)-(e) for disposing of presidential records. Judicial review of the President's action under these provisions is also unavailable. But guidelines describing which existing materials will be treated as presidential records in the first place are subject to judicial review.
 
 
 76
 Thus, although the PRA impliedly precludes judicial review of the President's decisions concerning the creation, management, and disposal of presidential records during his term of office, Armstrong I, 924 F.2d at 291, the courts may review guidelines outlining what is, and what is not, a "presidential record" to ensure that materials that are not subject to the PRA are not treated as presidential records. We remand to the district court to conduct this inquiry.
 
 
 77
 C. The PRA Definition of Presidential Records
 
 
 78
 Having held that the recordkeeping guidelines defining presidential records are subject to judicial review, and having remanded to the district court for that purpose, it remains for us to discuss the definition of "presidential records" to be applied on remand. As our previous discussion of the PRA, supra pages 1290, 1292-93, has undoubtedly indicated, we must turn again to the PRA provision exempting from its scope any materials that are official records of an agency, as "agency" is defined in the FOIA, 5 U.S.C. Sec. 552(f). 44 U.S.C. Sec. 2201(2)(A)(i). Congress expressly intended when it passed the PRA to preserve unchanged the coherent body of law that had been developed under the FOIA, and it is that body of law that provides the basis for our limited review of the definition of presidential records provided in the guidelines. The guidelines violate the PRA to the extent that they classify as presidential records materials that would otherwise be subject to the FOIA.
 
 
 79
 The FOIA definition of "agency" invoked in the PRA raises a clear but somewhat intricate set of references and cross-references. The FOIA provision mentioned in the PRA, 5 U.S.C. Sec. 552(f), incorporates the definition of agency provided at 5 U.S.C. Sec. 551(1): "agency means each authority of the Government of the United States, whether or not it is subject to review by another agency, but does not include ... the Congress ... [or] the courts of the United States." 5 U.S.C. Sec. 551(1). Section 552(f) itself adds an additional proviso:
 
 
 80
 [A]gency ... includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), [303 U.S.App.D.C. 128] or any independent regulatory agency.
 
 
 81
 5 U.S.C. Sec. 552(f). The Supreme Court has added still another layer of complexity, holding that for FOIA purposes, the EOP does not include the Office of the President. " '[T]he President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President' are not included within the term 'agency' under the FOIA." Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136, 156, 100 S.Ct. 960, 971, 63 L.Ed.2d 267 (1980) (quoting H.R.CONF.REP. No. 1380, 93d Cong., 2d Sess. 15 (1974)), 1974 U.S.C.C.A.N. 6267.
 
 
 82
 The Supreme Court test adopted in Kissinger for determining which entities within the EOP are agencies subject to the FOIA was originally developed by this court in Soucie v. David, 448 F.2d 1067 (1971). In Soucie, this court held that only entities whose "sole function [is] to advise and assist the President" are not separate agencies subject to the FOIA. Id. at 1075. Thus, the court concluded that the Office of Science and Technology ("OST")--the precursor of the OSTP, one of the agencies whose guidelines are at issue in this appeal--was an agency subject to the FOIA because its duties went beyond advising the President and included evaluating federal scientific programs. Id.
 
 
 83
 The legislative history of the PRA could not be clearer in indicating congressional intent to adopt the test articulated in Soucie to determine what entities are "agencies" subject to the FOIA:
 
 
 84
 The [PRA] does not modify the applicability of the [FOIA] to White House and [EOP] records.... That is, it does not redefine the term agency to include entities not now covered by the FOIA. The Conference Report for the 1974 Freedom of Information Act amendments stated that "[w]ith respect to the meaning of the term '[EOP]' the conferees intend the result reached in Soucie v. David, 448 F.2d 1067 [ (D.C.Cir.1971) ]. The term is not interpreted as including the President's immediate staff or units in the [EOP] whose sole function is to advise and assist the President."
 
 
 85
 H.R.REP. No. 1487, 95th Cong., 2d Sess. 11 (1978) (quoting H.R.CONF.REP. No. 1380, 93d Cong., 2d Sess. 13 (1974)), reprinted in 1978 U.S.C.C.A.N. 5732, 5742. The FOIA Conference Report quoted in the PRA legislative history is the same report upon which the Supreme Court relied in Kissinger, 445 U.S. at 156, 100 S.Ct. at 971.
 
 
 86
 This court has consistently applied the "sole function" test developed in Soucie and adopted in Kissinger in its subsequent decisions. In Ryan v. Department of Justice, 617 F.2d 781 (D.C.Cir.1980), we rejected the argument that certain records of the Attorney General regarding judicial nominations were not subject to the FOIA because the Attorney General was acting in his independent capacity as an advisor to the President when he prepared the records in question. Id. at 788. The Court explained that
 
 
 87
 Soucie did not intimate that the [OST] might be an agency only when performing its non-advisory functions, and still be a presidential staff component, or non-agency, when performing its other function of advising the President. In fact, the reports under consideration in Soucie were requested by the President precisely for advisory purposes, but we did not deem the [OST] to be a non-agency in that specific context.
 
 
 88
 Id. (citing Soucie, 448 F.2d at 1075-76). See also Pacific Legal Foundation v. Council on Environmental Equality, 636 F.2d 1259 (D.C.Cir.1980) (holding that the Council on Environmental Equality ("CEQ") is a FOIA agency because, in addition to advising the President, the CEQ coordinated federal environmental regulatory programs, issued guidelines for preparing environmental impact statements, and promulgated regulations for implementing the procedural provisions of the National Environmental Policy Act); Rushforth v. Council of Economic Advisers, 762 F.2d 1038 (D.C.Cir.1985) (holding that the Council of Economic Advisers is not an agency under the FOIA because its sole function is to advise and assist the President); Meyer v. Bush, 981 F.2d 1288 (D.C.Cir.1993) (holding that the President's [303 U.S.App.D.C. 129] Task Force on Regulatory Relief "f[alls] within the Soucie test as an entity whose sole function is to advise and assist the President").
 
 
 89
 We hasten to add that our opinion in Armstrong I did not hold as a matter of law that the NSC "produces both presidential and federal records" because the NSC "advises the President and has statutory obligations." See Armstrong, 810 F.Supp. at 347-48, 349 (citing Armstrong I, 924 F.2d at 286 n. 2.). The passage on which the district court relied appears as a footnote in the "background" section of our Armstrong I opinion, without any of the legal exposition that would be expected to accompany a holding announcing the resolution of a previously unsettled legal question. See Maggard v. O'Connell, 703 F.2d 1284, 1290-91 (D.C.Cir.1983) (statements in the background discussion of an opinion should not be construed as deciding unresolved legal issues, especially where the court was only reviewing and reversing a grant of summary judgment). The footnote appears to be nothing more than a description of the position of the defendants-appellants as embodied in the EOP regulations. See Joint Statement p 157 ("The records of the [NSC] staff are federal records if they were received or created in connection with the work of the statutorily-created [NSC].... The records of the NSC staff are presidential records if they were received or created for the President, the Assistant to the President for National Security, his Deputy, or a member of the White House staff independently of any meeting or policy and staff actions of the NSC or its various groups."). Consequently, Armstrong I did not provide the legal basis for distinguishing federal and presidential records nor decide the legal status of various NSC materials.
 
 
 90
 Although we hold in accordance with the PRA that materials subject to the FOIA are not presidential records, we are unable to ascertain on the record before us whether the guidelines defining presidential records inappropriately classify certain materials. We cannot determine with certainty whether materials that the guidelines classify as presidential records are in fact official records of an agency subject to the FOIA. The NSC appears to have routinely conceded its status as an "agency" subject to the FOIA in litigation regarding specific FOIA requests to the NSC. See, e.g., Lisee v. CIA, 741 F.Supp. 988 (D.D.C.1990) (NSC made requisite showing of exceptional circumstances and exercise of due diligence in processing FOIA request to justify stay of further proceedings); Willens v. NSC, 726 F.Supp. 325 (D.D.C.1989) (requested NSC documents were within the FOIA exemption for documents authorized to be kept secret in the interest of national defense or foreign policy); Halperin v. NSC, 452 F.Supp. 47 (D.D.C.1978) (same). The Supreme Court also appears to have assumed, without deciding the issue, that the NSC is a FOIA agency. See Kissinger, 445 U.S. at 156, 100 S.Ct. at 971 (stating that the FOIA requesters argued that certain documents which related to the [NSC] "may have been [NSC] records and therefore subject to the [FOIA]. See H.R.REP. No. [876, 93d Cong., 2d Sess. 8 (1974), 1974 U.S.C.C.A.N. 6274], indicating that the [NSC] is an executive agency to which the FOIA applies."). But the issue has never been definitively resolved, and the record before us does not contain sufficient facts for us to make the determination.
 
 
 91
 Moreover, the cross-appellees suggest that the materials in question may not be subject to the FOIA--even if the NSC is an "agency" under the FOIA--because they are not "official records" of the NSC. See Brief for Cross-Appellees at 44-48. The factual record is also insufficient to resolve this issue on appeal. Thus, we remand to the district court for further proceedings to determine whether the guidelines under review inappropriately classify as presidential records materials that would otherwise be subject to the FOIA.
 
 CONCLUSION
 
 92
 To recap: We affirm the district court's decision that the EOP and NSC electronic records management guidelines violate the FRA, reverse the district court's civil contempt finding, and remand to allow the district court to determine whether the challenged NSC and OSTP guidelines inaccurately [303 U.S.App.D.C. 130] classify some documents as presidential records.
 
 
 93
 So ordered.
 
 
 
 [1]
 Sections I and II of this opinion were authored by Circuit Judge Wald; Section IV was authored by Chief Judge Mikva
 
 
 [2]
 Originally, the EOP employed the "PROFS" computer system. In 1989, the EOP installed another "OASIS" system as an additional means of transmitting information among employees. The original PROFS system ceased operations in 1992. The NSC has its own PROFS system as well as a similar system known as "All-In-One."
 
 
 [3]
 The district court went on to find that older guidelines of the NSC and the EOP were deficient because, inter alia, some instructions did not tell staff how to save electronic records and did not differentiate between federal and presidential records. See 810 F.Supp. at 344-46
 
 
 [4]
 The appellants contend that the EOP is not a proper party to this action because it is the subparts of the EOP that are "agencies" under the APA. The appellants, however, never raised this argument in their briefs to the district court; accordingly, it has been waived. See, e.g., Association of Accredited Cosmetology Schools v. Alexander, 979 F.2d 859, 862 (D.C.Cir.1992)
 
 
 [5]
 Indeed, because we agree with the district court that federal records will be lost if only the paper documents are preserved, we need not address the flaws that it identified in earlier EOP and NSC recordkeeping documents. The legal insufficiency of a mere instruction to print out on-screen material is enough to create a risk that federal records will be permanently destroyed if the backup tapes are not preserved. Thus, we need not decide if additional errors in these instructions would also require the Archivist and agency heads to take curative steps to fulfill their statutory duties
 
 
 [6]
 The following exchange took place at argument:
 The Court: We agree ... that this system has, in the past, created some things that qualify as federal records ... ?
 Appellants' Counsel: We agree.
 
 
 [7]
 We note that the substantive importance of these documents is demonstrated by the frequency with which they have been used in recent years. They were used by the Tower Commission, congressional investigators and the Independent Counsel looking into the Iran-Contra affair; by the Department of Justice in connection with its prosecution of Manuel Noriega; and by the NSC's legal advisor in relation to the confirmation of Robert Gates as Director of the CIA. See Joint Statement pp 56-59
 
 
 [8]
 Our discussion assumes that directories, distribution lists, etc. become part of an electronic record when they are incorporated in that record to specify senders and receivers of documents. We believe such an assumption is warranted as the most natural way of understanding the relation between the substance of a message and its origin and destination. See also Appellants' Brief at 22 (referring to the disputed material as "information related to an electronic message"). Nonetheless, our conclusion is in no way dependent upon this assumption. If these electronic directories, distribution lists, etc., are perceived to be separate electronic records, making the paper renderings of the substantive notes copies, the paper records system maintained by the agencies would still fail to meet the Act's requirements since it would omit entirely a different class of documents that, as the Archivist acknowledges, are "appropriate for preservation" in situations like this one. See National Archives and Records Administration, Disposition of Federal Records 2 (1989) ("Sometimes papers normally considered nonrecord, such as transmittals or routing slips, acquire record status because they clarify the matter being documented.") (emphasis added); cf. 36 C.F.R. Sec. 1222.38 ("Agency recordkeeping requirements shall prescribe the creation and maintenance of records of the transaction of agency business that are sufficient to: ... (e) Document the formulation and execution of basic policies and decisions and the taking of necessary actions, including all significant decisions and commitments reached orally (person to person, by telecommunications, or in conference).")
 
 
 [9]
 The appellants attempt to minimize this fact by noting that traditional letters, memoranda, and phone calls do not always leave behind a historical trail including such information. This observation is beside the point. The key facts here are that this information is available on the electronic systems and that the defendant agencies have not taken any steps to retain it on their paper documents
 
 
 [10]
 At the same time, for the reasons discussed infra at pages 1286-87, we do not believe that our conclusion on this point is inconsistent with the Act's desire to balance this interest against the need for efficient records management. See Armstrong I, 924 F.2d at 292
 
 
 [11]
 Further, the agencies' assertion of unilateral discretion to discard part of a federal record is at odds with the FRA's specific requirement that federal records may be "alienated or destroyed" only with the approval of the Archivist. See 44 U.S.C. Secs. 3303a, 3314
 
 
 [12]
 We also reject the appellants' contention that the district court's injunctive order sweeps too broadly. First, they argue that the court's order requiring the Archivist immediately to seek the assistance of the Attorney General and notify Congress of that action ignores Armstrong I 's statements that the Archivist and agency heads could discharge their statutory obligations through informal, intra-agency mechanisms. See 924 F.2d at 296 n. 12. In this case, the Archivist had failed to take any actions--formal or informal--necessary to prevent the statutory violations. See Joint Statement p 237 (acknowledging that although Archivist's regulations require her to "periodically evaluate agency records management programs," the Archivist has never performed such an evaluation for the NSC and the EOP, has never reviewed their recordkeeping guidelines, and has never surveyed or inspected their e-mail systems). Given that circumstance, the district court did not abuse its discretion in ordering the Archivist to take the specific actions provided for in the statute. Similarly unpersuasive is the appellants' argument that the district court should not have enjoined the defendant agencies from destroying any electronic records until new guidelines were in place. Because these systems continue to produce federal records, the district court used its discretion appropriately in insisting upon a full-scale method for preventing the records' destruction until the agencies came up with new, adequate records management guidelines to replace the ones voided by the district court's declaratory order
 
 
 [13]
 In light of this disposition, we need not address the appellants' challenge to the second contempt ground or its claim of sovereign immunity from contempt fines. See Spallone, 493 U.S. at 274, 110 S.Ct. at 631 (finding it unnecessary to reach alternative first amendment and legislative immunity arguments after reversing contempt finding against city councilmembers on merits)