Jay Lee GATES; John Ronald Bertram,
Plaintiffs–Appellees,

v.

Ron SHINN; James Rowland; Nadim Khoury, M.D., Assistant Deputy Director—CDC Health Services; Kenneth Shepard, Chief Deputy Warden for CMF Clinical; Nicholas Poulos, M.D., Daniel E. Thor, Chief Physician and Surgeon, CMF; Paul Morentz, Chief Psychiatrist—CMF Outpatient Program; H MD; Bruce Baker; A R MD, Chief Psychiatrist Northern Reception Center; D. Michael O'Connor; Douglas G. Arnold, Acting Director of the California Department of Mental Health; Clyde Murrey, Acting Deputy Director for State Hospitals; Sylvia R.N., Executive Director DMH Vacaville Psychiatric Program; Eddie Ylst, Defendants–Appellants.

No. 94–17146.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 14, 1995.

Decided Oct. 16, 1996.

Peter Siggins, Senior Assistant Attorney General, San Francisco, CA, for defendants-appellants.

Michael W. Bien, Rosen, Bien & Asaro, San Francisco, CA, for plaintiffs-appellees.

Before: GOODWIN, FARRIS and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

Prison officials were held in contempt of court for failing to obey a consent decree. The issue in the case is whether a consent decree requiring "appropriate" psychiatric care is specific enough to empower a court to hold prison officials in contempt for failure to do so. We conclude that it is not.

## FACTS

Prisoners brought a class action challenging the constitutional adequacy of medical care at the California Medical Facility. The Facility is part of the California state prison system. It provides medical and psychiatric services for inmates from throughout the California state prison system. All members of the plaintiff class have been convicted of crimes, are being imprisoned for them, and have been sent to the Facility because of mental illness. The parties agreed to a consent decree. The provision of the decree at issue here required the facility to develop an outpatient psychiatric program which would provide "appropriate psychiatric evaluation and treatment" for prisoners. An interim program was to be in effect by June 30, 1990 and to be fully operational by October 31, 1990.[1]

---

**1.** In its entirety, the relevant provision reads:

*F. THE PROVISION OF APPROPRIATE PSYCHIATRIC CARE TO ALL PRISONERS AT CMF*

1. Defendants will provide appropriate psychiatric screening for each incoming inmate at CMF and will provide appropriate psychiatric evaluation and treatment for all inmates at CMF as medically indicated.

2. Defendants will prepare and implement a program, to be operational by June 30, 1990, to provide appropriate psychiatric care for prisoners discharged from the inpatient psychiatric programs at CMF and ASH. The outpatient program as implemented will address the following elements:

a. *Reducing regression as much as possible* by providing appropriate programing therapies;

b. Providing therapeutic programs designed to facilitate increased functioning, participation in prison programming and return to the general population;

c. Appropriate monitoring of medications;

d. Communication and consultation between inpatient and outpatient psychiatric staff.

3. Defendants will improve outpatient psychiatric services. The program will be in effect by June 30, 1990. Defendants will provide periodic reports to the Mediator concerning the program and its implementation. The program will be staffed and fully operational by

October 31, 1990. The outpatient program will address the following issues:

a. Staffing levels for psychiatrists, psychologists, social workers, recreational and occupational therapists, nursing staff and custodial staff will be sufficient to provide appropriate access to psychiatric evaluation and treatment programs for all prisoners at CMF requiring such programs;

b. The need for additional staff will be periodically assessed . . .

c. Treatment plans will be developed for all prisoners at CMF receiving psychiatric care. . . .

d. Each prisoner referred to CMF from another institution (or from another unit within CMF) for psychiatric evaluation or treatment shall be examined and evaluated by a member of the clinical staff within 24 hours of his arrival at CMF and provided with appropriate treatment. . . .

e. Appropriate space and facilities for treatment programs will be provided;

f. Appropriate access to psychiatrists and other mental health professionals will be provided to all prisoners based on their needs. The special psychiatric needs of prisoners diagnosed with HIV shall be addressed. All prisoners receiving psychotropic medications will be seen by a psychiatrist at appropriate intervals;

g. Medications will be appropriately monitored and appropriate medical records and charts will be maintained;

This appeal[2] arises from disagreements about whether the facility's "outpatient" program is consistent with the terms of the consent decree. The prisoners are of course not "outpatients" in the usual sense of the word. They do not get out. Generally, an outpatient is someone who gets treatment at a hospital but does not occupy a bed there. An ordinary outpatient goes home to bed. The "outpatients" in California Medical Facility's outpatient psychiatric program do not occupy a bed at the prison hospital, but they do stay in the Facility. Unlike most non-prisoner outpatients, they do not live in the outside community.

The consent decree has involved years of detailed supervision by the district court of the Facility. The warden filed a declaration that "more than 10 million dollars has been expended on construction, equipment, contract costs, compliance team costs, and the expenses directly related to *Gates*," but compliance has been found by the court to be so inadequate as to amount to contempt of court. The court has concluded that the consent decree requires much more extensive changes in staffing and methods of treatment than the Facility has been willing to adopt.

The prisoners moved to hold the officials of the Facility in contempt for failing to provide adequate care and for failure to meet deadlines set by the mediator. Pursuant to the consent decree, the court had appointed a mediator nominated by the defendants to develop institutional reforms in consultation with the prison officials, lawyers for the plaintiff class, prison psychiatry experts, and others. The district judge referred the motion to a magistrate judge, who directed the defendants to present a revised plan for an outpatient psychiatric program to the mediator.

The mediator and his experts reviewed the plan, and suggested thirteen modifications. The mediator recommended that the prison officials be found in contempt if they rejected the thirteen modifications. They declined, and the magistrate judge recommended to the district court that they be found in contempt.

The district court held the prison officials in contempt of court. The finding of contempt was based on the consent decree provision that the facility "provide appropriate psychiatric screening for each incoming inmate at CMF and ... provide appropriate psychiatric evaluation and treatment for all inmates at CMF as medically indicated." We are impressed with the difficulty of the problem faced by the district judge in trying to assure that the Facility provided adequate and appropriate treatment to avoid inhumane and dangerous conditions. We are also impressed by the daunting challenge the prison officials faced in dealing with mentally ill criminals in a way which would prevent them from hurting themselves or others, while trying to comply with the orders of a district court mediator. We conclude that the prison officials should not have been held in contempt of court, because the term "appropriate" had no specific meaning in this decree.

The mediator had construed "appropriate" to mean the "community standard of care" for outpatients. He thought his thirteen proposed modifications were in accord with a "community standard," the decree required that standard, and the prison had willfully refused to meet it. The prison officials had hired as the Facility's chief psychiatrist for program development a physician who had been the mediator's expert earlier in the litigation. That physician said there was no

h. Each prisoner request to see a psychiatrist or psychologist will be documented in writing and responded to appropriately.

i. Isolation and seclusion in their cells of prisoners in need of psychiatric care will be minimized.

4. In an effort to comply with paragraphs 2 and 3 above, defendants will implement their Outpatient Program Guide.

5. Defendants will evaluate their program for providing psychiatric evaluation and treatment in October 1990 and report to the Mediator by December 15, 1990. The Mediator, if

necessary, will independently investigate the program, in the determination of the adequacy of defendants' program for providing appropriate psychiatric services.

2. This consent decree has resulted in extensive litigation. Published decisions by this court stemming from this decree include: *Gates v. Deukmejian*, 987 F.2d 1392 (9th Cir.1992); *Gates v. Rowland*, 39 F.3d 1439 (9th Cir.1994); *Gates v. Rowland*, 60 F.3d 525 (9th Cir.1995).

such thing as a "community standard" of psychiatric care for prisoners with mental diseases. He said treatment in the community varied, what the mediator wanted was more than any community programs provided, and treating the prisoners as though they were in the non-criminal, non-institutionalized community would be inappropriate.

The district judge agreed with the prison officials that the decree did not adopt a "community standard" of outpatient psychiatric care. He found that the mediator's "community standard" was "not to be found within the four corners of the Consent Decree," and "has no recognizable criteria in psychiatric literature or practice," so "is too speculative to be enforced." The district judge nevertheless found the prison officials to be in contempt of court. The district court construed "appropriate psychiatric screening" and "appropriate psychiatric evaluation and treatment ... as medically indicated" to mean what he called a "clinical standard of care," referring to what was "medically indicated" under accepted "professional standards":

> For these reasons, the standard applicable to adequate Psychiatric care in this case is to be determined by the language of the decree. Section V.F.1. provides that defendants shall provide "appropriate" Psychiatric evaluation and treatment *"as medically indicated"* (emphasis added). This language clearly establishes a clinical standard for appropriate mental health care generally and for the adequacy of particular [outpatient Psychiatric program] elements, which are specified components of such care.
>
> The phrase "as medically indicated" as commonly understood, denotes care and treatment according to professional standards responsive to diagnostic criteria. The Decree by its terms affirmatively obligates defendants to provide treatment according to clinical psychiatric norms, rather than merely refraining from the deliberate indifference forbidden by the Eighth Amendment.
>
> All future determinations of compliance with the general "appropriate evaluation and treatment" provisions of section V.F.,

including the "appropriateness" of the various mandatory [outpatient Psychiatric program] elements specified in sections V.F.2 & 3, shall be made according to general clinical standards for the treatment of the psychiatric conditions at issue. This standard governs both the adequacy of the [outpatient Psychiatric program] plan and the adequacy of actual care and treatment to be provided under a fully implemented [outpatient Psychiatric program].

(citations omitted). Holding the prison officials in contempt of court, the court required them to comply with the mediators' thirteen proposed modifications, as an exercise of its remedial powers to cure the contempt. The judge explained that "where a finding of contempt has been made, the court may exercise its broad equitable remedial powers" and that "a remedial order following a contempt finding may include new requirements to serve the original intent of the consent decree." The court also determined that, even had a contempt finding not been made, enforcement of the thirteen proposed modifications would be appropriate under the consent decree.

The prison officials were "adjudged to be in civil contempt" and were sanctioned $10,000 per day for every day they were not in compliance. The court appointed the mediator to be a special master. The district court stayed the monetary sanctions so long as the prison officials complied with the special master's directives for implementation of the modified outpatient plan by the deadlines to be set by the special master. The special master was to report any failures by the prison officials to do what he said, when he said, and "[s]uch a report will result in the issuance of an Order to Show Cause before the district judge why sanctions should not become immediately due from the date of the certified violation until compliance with the proposed provision as certified by the Master."

We stayed the contempt order pending appeal.

## ANALYSIS

### A. Jurisdiction

■ The prisoners argue that we have no appellate jurisdiction because there is no fi-

nal order. The issue arises because the district court stayed the $10,000 per day penalty. We conclude that the order was final under 28 U.S.C. § 1291, so we have appellate jurisdiction.

■ Though the $10,000 per day in monetary sanctions was stayed, the district court order imposed two adverse consequences on the prison officials. First, the obloquy of contempt has been adjudicated against them. Second, the district court has required them to make the changes required by the special master, as a remedy for their contempt of court. This case is analogous to *Stone v. City and County of San Francisco*, 968 F.2d 850 (9th Cir.1992). As we held in *Stone*, neither the undetermined·total amount of sanctions, nor the fact that the sanctions are conditional, defeats finality of a post-judgment contempt order. *Id.* at 855. *Accord Shuffler v. Heritage Bank*, 720 F.2d 1141, 1145 (9th Cir.1983) ("Once the finding of contempt has been made and a sanction imposed, the order has acquired all of the 'elements of operativeness and consequences necessary to be possessed by any judicial order to enable it to have the status of a final decision under section 1291.'").

■ We have interpreted *Firestone Tire and Rubber Company v. Risjord*, 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981), in the context of a post-judgment contempt order imposing sanctions for violating a consent decree, as justifying review based on "pragmatic concerns." *Stone v. City of San Francisco*, 968 F.2d at 855. We balance the "inconvenience of piecemeal review" against the "danger of denying justice by delay." *Id.* A consent decree is a judgment. Where a decree has come down, the respondent has been held in contempt of court for violating it, and sanctions have been ordered for the contempt but stayed, the appealability of the contempt order depends on this "pragmatic" balancing. As in *Stone*, the balance tips in favor of allowing the appeal. We have already published three appellate decisions in this case, this being the fourth, so it is plainly impossible to avoid the "inconvenience of piecemeal review." The contempt order and $10,000 per day in sanctions amount to a persuasive hammer the special master is to

use against the prison officials, so the "danger of denying justice by delay" is plain if the prison officials cannot now litigate whether the thirteen modifications are required by the consent decree.

We conclude that pragmatic concerns weigh in favor of reviewing the contempt order now. We now determine whether the decree on which the order was based could properly serve as a basis for a contempt citation.

**B. Specificity of the Consent Decree**

The core of the prison officials' argument is that the decree was not specific enough, with regard to the matters at issue, to support a determination that they were in contempt of court for violating it. The provision at issue requires "appropriate psychiatric evaluation and treatment for all inmates at CMF as medically indicated." We analyze how the prison officials are supposed to have violated the decree, and whether the decree could support a finding that the psychiatric care afforded violated it.

**1. The required specificity.**

The order holding the prison officials in contempt focuses upon two violations of the consent decree: the prison officials failed to provide appropriate psychiatric care in the outpatient screening and treatment program, and failed repeatedly to comply with the mediator's deadlines for curing the inadequacies. Failure to meet deadlines to cure the violation of the decree could not furnish a basis for the contempt unless there was a violation of the decree. The contempt order therefore stands or falls on whether there was a violation of the consent decree. For the contempt order to stand, the decree has to have been specific enough to require the thirteen proposed modifications to the outpatient psychiatric plan.

■ An injunction must be "specific in terms" and describe "in reasonable detail" the acts sought to be restrained. Fed. R.Civ.P. 65(d). Specificity in the terms of consent decrees is a predicate to a finding of contempt. *Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889

(9th Cir.1982); *Harris v. City of Philadelphia*, 47 F.3d 1342, 1349 (3rd Cir.1995).

■ The consent decree is an injunction. A judgment issued by a court in the exercise of its equitable or admiralty jurisdiction is called a decree, and when a decree commands or prohibits conduct, it is called an injunction. Consent decrees differ from contested injunctions in that, instead of being won in contested litigation, they are issued by the court pursuant to an agreement of the parties. A consent decree is therefore "in some respects contractual in nature," but the equitable decree based on the agreement "is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378, 112 S.Ct. 748, 757, 116 L.Ed.2d 867 (1992). Courts must find the meaning of a consent decree "within its four corners," and not by reference to the court's purpose or the purpose of the party seeking to hold the other in contempt because the party seeking the contempt did not win its case:

> [T]he *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.

*United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971) (emphasis in original, footnote omitted).

■ If an injunction does not clearly describe prohibited or required conduct, it is not enforceable by contempt. As the Supreme Court has explained:

> The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.

*International Longshoremen's Ass'n. v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967).

As applied to this case, these requirements for specificity within the four corners of the decree require a distinction between the specificity of the consent decree, and the specificity of the mediator's recommendations. The consent decree itself, not merely the mediator's subsequent directives, must command the prison officials to provide the level of psychiatric care at issue, or else they cannot be held in contempt of court for failing to provide it. The problem of specificity is not whether the prison officials could avoid penalties by doing what they were told from time to time by the mediator. He could have no power to require more than the consent decree did. The only way to justify the contempt order is by finding that the requirement in the consent decree of an "appropriate" level of psychiatric care was sufficiently "specific in terms" to provide for what the mediator required.[3]

3. Emphasizing that the underlying concern when enforcing consent decrees is 'fair notice', the district court concluded that the mediator's directives gave the defendants "ample and repeated notice that their conduct violated the Decree." But fair notice must be found "within [the] four corners" of the consent decree. *See Armour*, 402 U.S. at 682, 91 S.Ct. at 1757. This requirement protects a party who agrees to a consent decree from obligations to which that party has not agreed. *Id.* at 681–82, 91 S.Ct. at 1757–58. The prison officials are not saying "we did not know we were supposed to use clozapine, have 2.5 staff to track developmentally disabled inmates, assemble dangerous inmates in groups for group therapy, and give our psychiatrists 20 hours a year of continuing medical education." They are saying "we do not think those requirements are 'appropriate,' and we did not agree to them when we consented to the decree."

## 2. The violation.

As we explain above, the consent decree itself had to be "specific in terms." We assume without deciding that the mediator's thirteen proposed modifications to the Facility's outpatient psychiatric plan were specific enough, so that had they been part of the consent decree, failure to implement them would support a contempt. The gravamen of the contempt was that the prison officials refused to adopt the thirteen modifications, which the court concluded were embraced by the consent decree requirement of an "appropriate psychiatric evaluation and treatment."[4]

We review now a few of the specific disagreements about the mediator's thirteen proposed modifications, to see whether the words of the consent decree provide sufficient specificity to resolve them. The prison officials presented evidence, mostly affidavits from Richard M. Yarvis, M.D., supporting their view of what was "appropriate."

The prison officials proposed to provide a coordinator to keep track of developmentally disabled and mentally retarded inmates, and ensure that they received all necessary psychiatric treatment. The mediator proposed a "team" for this purpose consisting of "0.5 Psychiatrist, 1.0 Psychologist, 1.0 Social Worker." Except for the psychiatrist, these staff "will not be assigned any collateral duties in the OPP"[5] and "will report to the chief psychiatrist for the outpatient psychiatric program." The chief psychiatrist for program development at the Facility stated this would be "an excessive expenditure of resources" for the case load of "approximately fifty developmentally disabled individuals" who reside at the Facility at any given time.

4. The district judge found that the prison officials had repeatedly failed to meet past deadlines, but expressly decided that "there remains no concrete action to compel via civil sanctions" regarding these past delays. The judge therefore did not hold the prison officials in contempt based on missed deadlines. 10/27/94 order at 18.

The judge found that the "outstanding noncompliance involves the substantive adequacy of defendant's submissions and actions." 10/27/94 order at 18. He noted that the magistrate had given the prison officials one last chance to submit a complete, revised plan for the Outpatient Psychiatric Program, but the mediator's experts concluded that it would satisfy the consent decree only if thirteen specified modifications were made. 10/27/94 order at 4–5. The judge found that the prison officials were not providing "appropriate evaluation and treatment for all inmates at CMF as medically indicated." 10/27/94 order at 19. He accordingly found them in contempt of section V.F of the consent decree.

In a footnote, the contempt order says that the facts establish "not only violations of the general mandate regarding appropriate care and an adequate OPP, but the particular requirements of appropriate medication, monitoring, evaluations, recordkeeping, etc. *See* Sections V.F.2 & 3." 10/27/94 order at 19.

The particulars referred to appear to be the disagreements discussed below relating to clozapine, staffing, treatment protocols, etc., though the order does not specify what they are. Sections V.F.2 and V.F.3 specify elements to be addressed in a plan "to provide appropriate psychiatric care," as by "appropriate programming therapies," "appropriate monitoring of medications," and "communication and consultation." A program to "improve" outpatient psychiatric services was to "address" issues including staffing levels sufficient to provide "appropriate" access to programs, examination within 24 hours of referral from another institution followed by "appropriate treatment" in "appropriate" facilities with "appropriate" access to staff, with medications to be "appropriately" monitored and responses to prisoner requests to see psychiatrists and psychologists to be documented in writing and responded to "appropriately."

There are some specifics not measured by the term "appropriate" in these subsections, but none of these specifics furnished the basis for the contempt determination. As is obvious from the quotations, all the more specific sections relating to the contempt measure the required conduct by what is "appropriate." The prison officials had one idea of what was "appropriate," furnished largely by their psychiatric expert, the mediator had another furnished by his psychiatric experts (the thirteen modifications), and the district court agreed with the mediator.

5. In the decree, the parties' briefs, and many of the quoted excerpts, the outpatient psychiatric program is referred to as an "OPP" and expanded versions of the outpatient program guide as "plans." Typically in institutional litigation, the lawyers working on the same case for years develop their own vocabulary of case-specific terms and abbreviations, sometimes built on the institution's internal set of abbreviations. The writer and most readers have never seen this case before and will probably never see it again, so for us, use of the case-specific terms and abbreviations obfuscate. We use descriptive terms rather than abbreviations in this opinion to save the reader the need to memorize an abbreviation vocabulary list in order to understand the opinion.

The mediator wanted the prison to use an antipsychotic medication called clozapine. The prison's psychiatric expert thought clozapine was too risky a medication:

Clozapine is a new medication and one to which some significant risks are attached. There is considerable disagreement at the present time among CMF psychiatrists as to whether clozapine can be used safely at the facility.... Moreover, new medications with potentially less risk are about to come on line in psychiatric practice.

The mediator wanted the Facility to adopt specific treatment protocols for various psychiatric conditions. Dr. Yarvis said that the psychiatric profession did not agree what specific treatment protocols were appropriate for most of the diseases the Facility had to deal with:

The American Psychiatric Association has addressed the problem of defining practice parameters for many months and to date has been unable to reach a consensus with respect to any but two diagnostic categories, depressive disorders and eating disorders. It is both unrealistic and unreasonable to expect the psychiatric staff at CMF will succeed in a few months where a preeminent psychiatric organization has failed to date.

The prison officials thought some of the thirteen proposed modifications would be too dangerous. Dr. Yarvis said "dangerousness adds an important dimension" because "many have been convicted of violent criminal offenses and have been sentenced by the courts to the custody of the CDC for that reason." For example, the thirteen proposed modifications required a group therapy program which Dr. Yarvis said raised "safety issues," and "may prove impractical when applied to a highly dangerous patient population such as is found at CMF." Dr. Yarvis pointed out that many of the patients suffered not only from their psychiatric disorders, but from "severe character pathology" which does "not yield readily and sometimes not at all, to psychiatric intervention." There were high levels of "treatment noncompliance," "malingering," and "inaccurate technical information provided to [clinicians] by patients." Additionally, the prison officials contended:

The August, 1994 Plan generally fails to account for the extremely dangerous, highly unpredictable nature of many [outpatient psychiatric program] inmates. CMF has one of the highest inmate-to-staff assault ratios in the [California prison system]. This is directly attributable to the type of inmates housed in the [program]. The August 1994 Plan displays a basic lack of understanding of the dangerous level of inmates, poor physical plant design, and staffing realities. Mandating extensive out-of-cell program time, without regard to inmate assaultiveness, will only serve to drive upward the number of inmate-on-inmate assaults and inmate-on-staff assaults. The Mediator apparently based the August, 1994 Plan in large part on community mental health facilities. He does not sufficiently acknowledge that the population served in mental health programs at CMF is more violent. This fact requires a much more secure environment than is found at any mental health program outside correctional facilities. This is a critical difference. CMF does not want to foster an environment that will be unsafe for inmates and staff.

The mediator also proposed twenty hours of continuing medical education per year for psychiatrists, but Dr. Yarvis said this exceeded any standard with which he was familiar, and was far in excess of what he thought was needed, which would be four to five hours of psychopharmacological training per year.

As these disputes illustrate, the prison officials and the mediator differed, from the standpoint of what was medically indicated, regarding whether the thirteen proposed modifications would be "appropriate psychiatric evaluation and treatment" or not. The issues were matters of medical and administrative expertise. The district court never said that it was rejecting Dr. Yarvis's opinions as to what was "appropriate psychiatric evaluation and treatment," or explained why the mediator's view and not Dr. Yarvis's was correct with regard to what sort of psychiatric care was "appropriate."

### 3. Was the decree sufficiently specific?

The district court order, effectively turning much control of the Facility over to a special master, raises troubling issues in the context of a correctional institution. We are required to "accord deference to the appropriate prison authorities." *Turner v. Safley,* 482 U.S. 78, 85, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). These inmates, in addition to being criminals, are mentally ill, so some of the restraints which induce sane people to behave themselves even if of a criminal disposition will not restrain these inmates. As the prison officials' evidence showed, the inmates are more apt than non-criminal victims of mental illness to lie about their symptoms, sell their medication, and injure or kill staff, each other, and themselves. The mentally ill and disabled people would not have been convicted of crimes and placed in the Facility, after all, had they not demonstrated an inability or disinclination to behave themselves.

The issue of specificity of the consent decree, in this context, amounts to a choice of who decides, whose view shall prevail, on disagreements such as those described above. If the parties had consented to a decree which provided with specificity that the thirteen proposed modifications should prevail, or provided for a specific standard compelling them, then the district court would decide whether the prison psychiatric regime met the standard. In the absence of a decree "specific in terms," the district court would lack the power to decide. We now examine the meaning of the phrase in the decree, "appropriate psychiatric evaluation and treatment," as construed by the district court to mean a "clinical standard" for psychiatric evaluation and treatment "as medically indicated," to see whether it is specific in terms with reference to the dispute about the level of psychiatric care.

█ The question is whether there was a specific meaning to the term "appropriate level of psychiatric evaluation and treatment," with or without the modifiers "as medically indicated," and "clinical standard." These sound like meaningful professional medical terms, but no showing was made of any specific meaning to them in the prison psychiatric context.

Here are a few of the many things a "medically indicated" level of "appropriate" psychiatric could mean: (1) avoidance of "egregious or flagrant conditions" which would violate the civil rights of institutionalized persons under 42 U.S.C. § 1997a(a); (2) the level of care in other state psychiatric prison facilities; (3) the level of care in federal institutions; (4) recommendations in some medical treatise; (4) standards published by some professional association, perhaps the American Medical Association, American Psychiatric Association, or American Correctional Association; (5) state medical malpractice standards; (6) treating physician's recommendations; (7) chief psychiatrist's recommendations; (8) California private medical insurers' standards for what treatment is compensable; (9) provisions commonly written into California private health maintenance organization contracts; (10) accreditation standards of some relevant professional board; (11) the Eighth Amendment, had the decree not expressly rejected that as the standard.

The practical effect of such a vague standard, "appropriate" psychiatric care, is that the prison, and the state budget for the prison, remain under the continuing and largely unfettered supervision of the district court and its magistrate judge, mediator, special master, and experts, instead of the state political process and appointed prison administrators.

The vagueness of the psychiatric care standard is in striking contrast to other parts of the consent decree. For example, the decree requires the prison officials to "develop written treatment guidelines," nonbinding, for nine listed diseases, such as asthma, tuberculosis, and diabetes mellitus. Mental illness is not in the list, and the prison's psychiatric expert says such protocols would be impractical because the profession has not agreed on any except for eating disorders and depression. Yet the contempt order implicitly assumes that the prison officials consented to developing written protocols for all mental illnesses. The consent decree says that the prison officials must hire a particular consul-

tant to assess and develop a quality assurance program, and the consultant must use the standards of the Joint Commission on the Accreditation of Healthcare Organizations for that purpose. Yet the only standard for assessment and development of the psychiatric program is the meaningless one that it should be "appropriate." The lack of specific terms in the decree by which to measure, implies that the prison officials did not consent to having the court decide whether the level of psychiatric evaluation and treatment measured up.

This case is not distinguishable from *Balla v. Idaho State Bd. of Corrections,* 869 F.2d 461 (9th Cir.1989). In *Balla,* we held that an injunction requiring a "systematic" screening program and "sufficient" mental health professionals could not support a contempt finding:

> Civil contempt is appropriate only when a party fails to comply with a court order that is both specific and definite. Thus, to support a contempt motion, the order alleged to have been disobeyed must be sufficiently specific. The standards cited by the prisoners in the November 1 order are too vague to support a contempt motion. They include such requirements as a "systematic" program for screening and evaluation, participation of "sufficient" numbers of mental health professionals, and implementation of a "basic" program for identifying, treating and supervising suicidal prisoners.

*Id.* at 465 (internal citations omitted). This is not a holding to be avoided by substituting some unspecific words, like "appropriate," for others, like "sufficient."

We acknowledge our holding in *Gates v. Shinn,* 60 F.3d 525 (9th Cir.1995) that "appropriate psychiatric treatment as medically indicated" is "a sufficiently specific standard with which to judge defendants' compliance." *Id.* at 531. That case, however, involved a challenge to a tactic for controlling mentally ill inmates that "ha[d] not been approved by the American Psychiatric Association, the American Medical Association, or any other correctional standard setting body." *Id.* at 528. The standard of "appropriate treatment" was sufficient because the tactic was

so clearly inappropriate. By contrast, reasonable minds can and do differ as to whether the defendant's outpatient plan provided for "appropriate psychiatric treatment." The standard of "appropriateness" is therefore insufficiently specific to uphold the district court's contempt order.

## CONCLUSION

The order finding the prison officials in contempt and imposing sanctions and additional requirements on them is VACATED, and the decision of the district court is REVERSED. The consent decree cannot support a contempt finding for failure to provide an "appropriate level" of psychiatric screening and care, because that provision does not command any conduct with specificity.

We do not reach the prison officials' argument that they were not afforded due process in the contempt proceedings, because we vacate the contempt citation on other grounds. We also do not reach such questions as may arise under the Prison Reform Litigation Act, Public Law No. 104–134, changes in 18 U.S.C. § 3626(b)(2), 18 U.S.C. 3626(f), 18 U.S.C. § 3626(a). We have dealt only with the matter put before us on appeal, the contempt order for alleged past violation of a decree. The effect of the Prison Reform Litigation Act on the decree will doubtless be raised before the district court.