UNITED STATES of America, Petitioner,

v.

MICROSOFT CORPORATION,
Respondent.

No. CIV.A. 94–1564 TPJ.

United States District Court,
District of Columbia.

Dec. 11, 1997.

Donald J. Russell, U.S. Dept. of Justice, Anti-Trust Division, Telecomm/Task Force, Washington, DC, Anne K. Bingaman, U.S. Dept. of Justice, Antitrust Division, Washington, DC, Phillip R. Malone, Steven C. Holtzman, U.S. Dept. of Justice, Antitrust Division, San Francisco, CA, for U.S.

Margaret Kolodny Pfeiffer, Sullivan & Cromwell, Washington, DC, James R. Weiss, Preston, Gates, Ellis & Rouvelas Meeds, Washington, DC, Richard J Urowsky, Steven L. Holley, Sullivan & Cromwell, New York City, William H. Neukom, Microsoft Corp., Law Dept., Redmond, WA, for Microsoft Corp.

Gary Leland Reback, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for amicus Doe Parties.

Howard A. Topel, Mullin, Rhyne, Emmons & Topel, Washington, DC, for Lantec, Inc.

Jeffrey Steven Jacobovitz, Michaels, Wishner & Bonner, P.C. Washington, DC, for I.D.E. Corp.

John Haven Chapman, Tenzer & Greenblatt, L.L.P., Washington, DC, for Computer & Communications Industry Association.

Anthony R. Martin, Palm Beach, FL, pro se.

David Paul Murray, Willkie Farr & Gallagher, Washington, DC, for Bloomberg News.

*MEMORANDUM AND ORDER*

JACKSON, District Judge.

Current proceedings in this civil antitrust case were commenced by the petition of the United States, filed October 20, 1997, for an order to respondent Microsoft Corporation ("Microsoft") to show cause why it should not be found in civil contempt of the consent decree that brought the action to a temporary conclusion on August 21, 1995, namely, the Final Judgment entered by this Court on that date (hereinafter "Final Judgment" or "consent decree"). Microsoft has joined issue, and the matter is before the Court for decision on the merits.

## I.

On July 15, 1994, the United States sued Microsoft, charging it with an unlawful monopoly and restraint of trade in the market for personal computer ("PC") operating system software under Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1, 2. The complaint alleged, among other things, that Microsoft had engaged in multiple anticompetitive marketing practices directed at PC manufacturers who preinstall operating system software on the PCs they produce for retail sale. The parties ultimately agreed, after extensive negotiations, to the terms of the consent decree that resolved most issues.[1]

The government submits that this first post-judgment enforcement proceeding is necessitated by what it has lately discovered to be a pervasive and ongoing violation by Microsoft of a provision of the Final Judgment. That provision, Section IV(E)(i), in pertinent part, prohibits Microsoft from requiring original equipment manufacturers ("OEMs") of PCs to commit to licensing other Microsoft products in order to obtain licenses to install Microsoft's PC operating system products.[2]

The government observes that Microsoft has enjoyed for some time a virtual monopoly in the sale of PC operating system software, and presently possesses a market share approaching eighty percent. Because most retail purchasers of PCs expect to receive a preinstalled operating system on the PCs they buy, OEMs routinely preinstall operating system software on the hard disk drive memory of nearly all PCs they manufacture. Consumer preference for Microsoft's most recent and most successful PC operating system, Windows 95, has made it a commercial necessity for OEMs to preinstall Windows 95 as the operating system software of choice on the vast majority of the PCs they manufacture, and virtually all of them do so.[3]

The present controversy arises from Microsoft's practice of including, in its licensing agreement with OEMs, a requirement that, as a condition of acquiring the right to Windows 95, they also accept a product known as the Internet Explorer ("IE"), a web "browser" that affords the PC user access to the Internet.[4] The licensing agreements also prohibit OEMs from disassembling the package; IE must remain as a component of the PCs' operating system software when they are shipped for retail sale, whether or not OEMs or their customers would prefer another brand of Internet browser, or none at all.

In other words, the government charges that Microsoft coerces OEMs to license and distribute the Internet Explorer whether they want to or not, even though, the government asserts (and Microsoft vehemently denies), refusing to install Microsoft's browser will not affect the functioning of the underlying Windows 95 operating system in any other significant respect. The effect, says the government, is a classic "tying" arrangement by which Microsoft is exploiting its operating systems monopoly in violation of an express term of the Final Judgment.[5]

---

1. Prior proceedings under the Tunney Act, 15 U.S.C. § 16(e) (1988), with respect thereto are reported at *U.S. v. Microsoft Corp.*, 159 F.R.D. 318 (D.D.C.), *remanded*, 56 F.3d 1448 (D.C.Cir. 1995).

2. Section IV(E) provides that:
   Microsoft shall not enter into any License Agreement in which the terms of that agreement are expressly or impliedly conditioned upon:
   (i) the licensing of any other Covered Product, Operating System Software product or other product (provided, however, that this provision in and of itself shall not be construed to prohibit Microsoft from developing integrated products).

3. As defined in the Final Judgment, "operating system software" is the "set of instructions, codes, and ancillary information that controls the operation of a Personal Computer System and manages the Interaction between the computer's memory and attached devices such as keyboard, display screens, disk drives, and printers." Final Judgment ¶ 14.

4. A "browser" is essentially an interface between an individual PC and the Internet. It is a software application that allows users to access, retrieve, and view material on the Internet. Competing browsers include Netscape Communication Corp.'s "Navigator."

5. A tying arrangement is "an agreement by a party to sell one product [the tying product] but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product

## II.

Section IV(E)(i) of the Final Judgment prohibits Microsoft from entering into any operating system license agreement that is "expressly or impliedly conditioned upon the licensing of any ... *other product*" (emphasis supplied). The same section goes on, however, to provide that "this provision in and of itself shall not be construed to prohibit Microsoft from developing *integrated products*" (emphasis supplied). A critical element of the present dispute, therefore, is whether Internet Explorer is to be deemed as "integrated" component of Windows 95, or, to the contrary, an "other product," distinct and severable from the operating system without otherwise impairing the system's operational integrity.

The government contends that Internet Explorer possesses both a physical and commercial existence of its own, separate and apart from any Microsoft operating system, and is regarded as such by Microsoft itself when it suits its purposes. It is, therefore, an "other product" within the meaning of § IV(E)(i). All Internet browsers, IE included, currently enjoy independent consumer demand and are regularly licensed and distributed separately from operating systems.

Microsoft's reaction is one of astonishment that the government has taken the position that the proscriptive language of Section IV(E)(i) was never meant to encompass the relationship of Windows 95 and the Internet Explorer. At the time agreement on the terms of the consent decree was reached, the "integration" of IE and Windows 95 as a matter of cybernetic engineering was nearly complete, had been fully revealed to the government, and, to Microsoft's way of thinking at least, represented the archetype of an 'integrated' product.

Microsoft claims that, during negotiations with the government, it made clear its position that the marketplace, and not the government, should dictate the evolution of the operating system and the features it incorporates. Microsoft points out that the government's original complaint made no reference to tying,[6] and that the government publicly acknowledged as much in a response to complaints about Microsoft's licensing practices. In that response, the Department of Justice ("DOJ") stated that its original complaint did "not challenge as violations of the antitrust laws Microsoft's inclusion of new software features in its operating system products." *See* Response of the United States to Public Commerce Concerning the Proposed Final Judgment and Notice of Hearing, 59 Fed. Reg. 59,426, 59,428 (1994). DOJ also acknowledged that "[w]henever Microsoft adds an attractive feature to its operating system products, it reduces the demand for software products sold by third parties as a complement to the Microsoft product that performed similar functions." *Id.*

Microsoft contends that DOJ has known since at least July 1994 of Microsoft's intention to include Internet-related technologies in Windows 95. Before July 1994, Microsoft produced to DOJ a number of documents disclosing its intention to make Internet-related technologies, including Web browsing functionality, an integral part of Windows 95. In April 1994, Microsoft chairman and chief executive officer Bill Gates publicly announced Microsoft's intention to include Internet software in Windows 95. And when the Final Judgment was entered in August 1995, Microsoft had already supplied a version of Windows 95, bundled with an early version of IE, to computer manufacturers.

Microsoft asserts that a reservation of its "unfettered right to incorporate new features into its operating systems" was a necessary and critical precondition to its willingness to enter into the consent decree. *See* Mem. of Microsoft in Opp'n to Pet. for Show Cause Order ("Microsoft Mem.") at 13. According to Microsoft, the "integrated product" proviso of § IV(E)(i) was the result of Microsoft's insistence—and the government's acquies-

---

from any other supplier." *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (footnote omitted).

**6.** According to Microsoft, the question of tying was first raised by Directorate General IV ("DG IV"), the competition authority of the European Union in Brussels, which was conducting its own investigation of Microsoft in 1994.

cence—that Microsoft would retain complete discretion to decide what features to include in its operating systems, limited only by the antitrust laws generally.

Finally, Microsoft argues, even if IE might be considered a "separate product" for some purposes, there is no reason it cannot also be part of an "integrated product" under § IV(E)(i). It points out that nearly every new feature incorporated into its operating systems over the last sixteen years was once available separately. Windows 95 itself integrated the functionality of two products—DOS 6 and Windows 3.1, each of which was available separately—into its single new operating system. According to Microsoft, "integrated" means nothing more than "combined," "united," or "incorporated into." *See* Webster's Third New International Dictionary 1174 (1965). An "integrated product," Microsoft contends, is one like Windows 95, consisting of a wide range of features and functions that—although they may also be available separately—have been "combined" or "united" together.

### III.

■ At the outset the Court is presented only with the limited question of whether it must adjudge Microsoft in civil contempt of the Final Judgment. Given the present record the Court cannot conclude by "clear and convincing evidence" that Microsoft violated a "clear and unambiguous" prohibition found in the consent decree. *See Armstrong v. Executive Office of the President,* 1 F.3d 1274, 1289 (D.C.Cir.1993) (internal quotation marks omitted).

■ The Court must resolve any ambiguities in the terms of the Final Judgment in favor of Microsoft, the party charged with contempt. *See Common Cause v. Nuclear Regulatory Comm'n,* 674 F.2d 921, 927–28 (D.C.Cir.1982). Microsoft offers a plausible interpretation of what it considers to be an "integrated product" as the term is used in § IV(E)(i): a product that "combines" or "unites" functions that, although capable of functioning independently, undoubtedly complement one another. Windows 95 and IE enjoy such a synergy, Microsoft argues.

As Microsoft correctly observes, placing reliance on amorphous considerations, requiring the balancing of multiple factors to ascertain whether a party subject to a judicial order is in violation of its terms, is inconsistent with the requirement that a judicial order provide "explicit notice of precisely what conduct is outlawed." *See Schmidt v. Lessard,* 414 U.S. 473, 476, 94 S.Ct. 713, 715, 38 L.Ed.2d 661 (1974); *see also Gates v. Shinn,* 98 F.3d 463, 472 (9th Cir.1996) (vague standard in consent decree not sufficient to support civil contempt motion), *cert. denied,* —— U.S. ——, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997).

In short, Microsoft has demonstrated, at the very least, the ambiguity of the term "integrated product." Microsoft has advanced a plausible interpretation of the term, and has provided a reasonable explanation for its understanding that the consent decree did not preclude Microsoft's insistence that OEMs accept IE as part of Windows 95. The government has not clearly convinced the Court that Microsoft violated a "clear and unambiguous" provision of the consent decree. *Armstrong,* 1 F.3d at 1289. Accordingly, the Court declines to hold Microsoft in civil contempt of the Final Judgment.

### IV.

Although the government has not satisfied the evidentiary burden necessary to sustain a finding of contempt, it does not necessarily follow that Microsoft's licensing practices are, in fact, in compliance with the terms of the Final Judgment. Notwithstanding the Court's conclusion that Microsoft's interpretation of § IV(E)(i) is *plausible* in light of the circumstances surrounding the negotiation of the consent decree, the Court is also not convinced that the interpretation is the *correct* one. The multi-factor test proffered by the government to distinguish "integrated products" from "other products" employs criteria applied by other courts in analyzing tying claims generally. Considering the totality of the circumstances surrounding the initiation, negotiation, and execution of the consent decree, the Court is preliminarily inclined to agree with the government's rea-

sons for interpreting § IV(E)(i) as it does in light of its objective purpose.

To begin with, Microsoft acknowledges that § IV(E)(i) was drafted in contemplation of the possibility that Microsoft was engaged in illegal "tying"—licensing one product on the condition that a computer manufacturer also agree to license a separate stand-alone product. *See* Microsoft Mem. at 12–14. Considering the purpose of including such a provision in an antitrust consent decree, it seems reasonable to interpret its language as it is generally understood in similar contexts. *See Carey Canada, Inc. v. Columbia Cas. Co.,* 940 F.2d 1548, 1556 (D.C.Cir.1991) (reasonable to interpret ambiguous term by relying on the term's specialized meaning within a particular trade).

■ For an arrangement to be considered an unlawful tying, it must, as an initial matter, involve two "separate products." *See Fortner Enters., Inc. v. United States Steel Corp.,* 394 U.S. 495, 507, 89 S.Ct. 1252, 1260–61, 22 L.Ed.2d 495 (1969).[7] Citing the functional synergies and interdependence of IE and Windows 95, Microsoft argues, as noted above, that the products, when combined, constitute a single "integrated" product in the cybernetic engineering sense of the term. However, the Supreme Court rejected a similar argument in *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), albeit in a less recondite controversy. In holding that anesthesiology services constituted a product separate from the other facilities and services provided by a defendant hospital, employing the lexicon of conventional antitrust analysis the Supreme Court rejected the argument that they should be considered one product because they constituted a "functionally integrated package of services." *Id.* at 18–19, 104 S.Ct. at 1561–62. The Supreme Court stated that "the answer to the question whether one or two products are involved turns not on the functional relation between

them, but rather on the character of *demand* for the two items." *Id.* at 19, 104 S.Ct. at 1562 (emphasis supplied). It explained that whether two products are involved depends on whether the arrangement links two distinct product markets that are "distinguishable in the eyes of buyers." *Id.* at 19–21, 104 S.Ct. at 1562. Because patients understood that anesthesiology services could be purchased separately from other hospital-based amenities, the Supreme Court held that these were two separate products.

Eight years later, in *Eastman Kodak Co. v. Image Technical Services,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), the Supreme Court applied its *Jefferson Parish* criteria in considering whether service and parts for the maintenance of copier equipment constituted "separate products." For service and parts to be considered distinct products, the *Eastman Kodak* Court said that "there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts." *Id.* at 462, 112 S.Ct. at 2079. That test was satisfied in *Eastman Kodak* by evidence that service and parts had been sold separately in the past and continued to be offered separately to equipment owners capable of servicing their own copiers. *Id.* at 463, 112 S.Ct. at 2080.

While the government disputes Microsoft's claim that IE and Windows 95 are functionally integrated as a matter of software engineering, the government focuses primarily on the separate marketing practices and independent consumer demand that exists for the two products. Such an analysis relies on the very same factors considered by the Supreme Court in *Jefferson Parish* and *Eastman Kodak.* Reading § IV(E)(i) in light of its avowed purpose raises a logical inference that the parties anticipated the use of such antitrust precedents in determining the application of that section to the conduct the government challenges here, *viz.,* condition-

---

7. A tying arrangement will generally be treated as *per se* unlawful, and thus prohibited without proof of an unreasonable anticompetitive effect, if: (1) two separate products or services are involved: (2) the sale or agreement to sell one product or service is conditioned on the purchase of another; (3) the seller has sufficient economic power in the market for the tying product to enable it to restrain trade in the market for the tied product; and (4) a not insubstantial amount of interstate commerce in the tried product is affected. *See Fortner Enters,* 394 U.S. at 498–99, 89 S.Ct. at 1256–57.

ing the licensing of one product on the agreement to license another product that enjoys substantial independent consumer demand.

In short, and contrary to Microsoft's claim to absolute discretion to dictate the composition of its operating system software, it appears not unlikely, as a matter of contract, that Microsoft's "unfettered liberty" to impose its idea of what has been "integrated" into its operating systems stops at least at the point at which it would violate established antitrust law. At oral argument on December 5, 1997, Microsoft's counsel conceded that the company could not declare that certain of its other products, such as its "Word" and "Excel" software, are "integrated" elements of its operating system. *See* Tr. at 41–42. Under Microsoft's expansive reading of the parenthetical in § IV(E)(i) however, it is unclear what distinguishes those particular products from Internet Explorer. Adopting Microsoft's interpretation would appear to render § IV(E)(i) essentially meaningless.

## V.

Having concluded that § IV(E)(i) does reach Microsoft's controversial licensing practices in some respect, the ultimate question for the Court—whether Microsoft is actually violating § IV(E)(i)—remains to be decided. Without the benefit of further evidence in the record, an attempt to answer that question would be premature. Disputed issues of technological fact, as well as contract interpretation, abound as the record presently stands.

According to Microsoft, the Internet Explorer element of Windows 95 provides numerous "application programming interfaces" availed of by both Microsoft and independent software developers. Historically, PC operating systems have always served, in part, to coordinate a user's access to various sources of information, including internal hard drives, floppy disk drives, random access memory ("RAM"), and CD–ROM drives. Providing access to the Internet—another information source—*via* a Web browser is simply a natural "next step" in operating system design.

But Microsoft claims that Internet Explorer offers the operating system substantially more than mere Web browsing capability. For example, it says, Microsoft and other software developers use IE components to provide networking support and user interface features, to display Hypertext Markup language text and graphics, and to launch other Internet access software, such as America Online and CompuServe. According to Microsoft's Vice President in charge of developing Internet Explorer, disengaging IE from Windows 95 would cause other portions of the operating system to "break." *See* Declaration of David Cole ("Cole Decl.") ¶¶ 51.62.65, 72.77,90.

The Court will permit the parties an appropriate period in which to conduct discovery, following which the Court will entertain further proceedings on the merits of the government's claims and its prayer for permanent injunctive relief. In the interim, the Court has the authority, and the duty, to enforce the terms of its Final Judgment as it reads it, to which end a preliminary injunction is the most appropriate instrument to maintain the *status quo* and preserve the Court's ability to fashion the least disruptive remedy if the evidence warrants.

■ In order to impose a preliminary injunction, of course, the Court must determine: (1) whether petitioner has a substantial likelihood of success on the merits; (2) whether the petitioner will suffer irreparable injury if injunctive relief is denied; (3) whether the respondent will suffer a disproportionate injury if injunctive relief is granted; and (4) whether the public interest favors the entry of the injunction. *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977); *see also CityFed Fin. Corp. v. OTS,* 58 F.3d 738, 746 (D.C.Cir.1995). Here, a reckoning of those factors favors the issuance of a preliminary injunction, pending further discovery and a definitive resolution of the merits.

■ To succeed on the merits of its claim that Microsoft is violating § IV(E)(i), the government must show that Microsoft has conditioned its Windows 95 license agreements upon OEMs' commitment to license an "other product," namely Internet Explorer.

Based on the present record, and interpreting § IV(E)(i) in light of its ostensible purpose, the government appears to have a substantial likelihood of success on the merits. Microsoft admits that it conditions its Windows 95 license agreements on OEMs agreeing to license and distribute IE, and the government has shown that there exists sufficient independent consumer demand for operating systems and Internet access software "so that it is efficient for a firm to provide" those products "separately," as Microsoft has concededly done. *Eastman Kodak,* 504 U.S. at 462, 112 S.Ct. at 2079–80.

■ The balance of harms also favors the issuance of a preliminary injunction. Microsoft presently offers its latest edition of the Internet Explorer, IE 4.0, only as a separate, stand-alone product, and has not yet required OEMs to license or preinstall it as a precondition to licensing Windows 95. Beginning in February 1998 (or possibly even earlier), however, Microsoft intends to require OEMs to license and preinstall IE 4.0 as a term of their Windows 95 license agreements, as it is presently doing with IE 3.0. Enjoining Microsoft from imposing such conditions will not cause a significant hardship. Microsoft will remain free to market and promote IE 4.0 just as it presently does—or in any other manner it sees fit—so long as OEMs are given the choice of whether or not to accept the product. Enjoining Microsoft *pendente lite* from forcing OEMs to accept and preinstall the software code that Microsoft itself now separately distributes at retail as "Internet Explorer 3.0"[8] similarly imposes no undue hardship on Microsoft. If, on the other hand, Microsoft continues with its "integration" process in the expectation that its licensing practices will continue to make it ever more profitable to do so, the cost of a compulsory unbundling of Windows 95 and IE in the future could be prohibitive.

■ Finally, the marketplace, and the public generally, will benefit from the issuance of a preliminary injunction. The government believes that Microsoft's licensing strategy is motivated by a threat Microsoft apprehends in the foreseeable future to its operating system monopoly. Independent software developers generally write new applications to run on a specific operating system, Windows 95 or its predecessors being currently by far the most common in use. According to the government's prognostication, if more users employ an Internet browser technology as an alternative to using the underlying operating system directly (as the Court is informed it is possible to do), software developers will have an incentive to write their applications to conform to alternative Internet specifications, rather than to Windows requirements. Microsoft's licensing strategy is allegedly designed to overwhelm the developing competition in the browser market (which at the moment Microsoft does *not* dominate) before it becomes established, thereby perpetuating Microsoft's operating system monopoly.

Whether or not the government has correctly divined Microsoft's intentions, the probability that Microsoft will not only continue to reinforce its operating system monopoly by its licensing practices, but might also acquire yet another monopoly in the Internet browser market, is simply too great to tolerate indefinitely until the issue is finally resolved. Those practices should be abated until it is conclusively established that they are benign.

## VI.

As a final matter, the government challenges certain language contained in some of Microsoft's contracts and other agreements with firms with which it does business, including OEMs. Microsoft requires them to sign various forms of non-disclosure agreements ("NDAs") or to agree to non-disclosure covenants in their other undertakings with Microsoft. These NDAs restrict the signatories' liberty to disclose information that Microsoft alone determines and declares to be "confidential." Some NDAs, the government alleges, purport to forbid the dis-

---

8. It is not the Court's intention that OEMs be required to delete IE 3.0 from PCs on which it has already been installed. The Court has fashioned the injunction to apply prospectively only, thus obviating Microsoft's concerns regarding "ripping out" the IE code after it has been installed.

closing party to disclose "confidential" information voluntarily to anyone, including the government, and even require the disclosing party to notify Microsoft in advance before furnishing information pursuant to a judicial or other governmental order of compulsion.

The government submits that the presence of such provisions in Microsoft's contract documents creates a serious potential impediment to the Court's ability to enforce the Final Judgment effectively, and DOJ's ability to fully investigate the extent of Microsoft's compliance with the consent decree. Accordingly, the government seeks an order voiding any existence requirements for NDA signatories to notify Microsoft of any contacts or discussions with, or disclosure of information to government investigative agencies and barring the inclusion of any such requirements in future Microsoft NDAs or other contracts.

In support of its claim, however, the government has so far offered nothing more than speculation that the NDAs *might* deter OEMs from coming forward to assist DOJ in its investigation. The record is devoid of evidence establishing that any party has, in fact, been deterred from communicating complaints about Microsoft to the DOJ. Furthermore, Microsoft has informed DOJ on several occasions that it does not interpret the NDAs to forbid parties from communicating with DOJ or requiring them to notify it when summoned to do so, and has not invoked them to that end.

█ There is no evidence of record that the NDAs are meant for any purpose other than to require that Microsoft be given notice and an opportunity to object before any confidential information is disclosed that might be of value to a commercial adversary. Accordingly, the Court will deny, without prejudice, the government's request to strike the NDA provisions from the license agreements and other contracts.

For the reasons set forth above, it is, the 11th day of December 1997,

ORDERED, that the petition of the United States for an order adjudging Microsoft Corporation in civil contempt of the Final Judgment of August 21, 1995, is denied; and it is

FURTHER ORDERED, that the prayer for an order striking certain contract language is denied without prejudice; and it is

FURTHER ORDERED, that the issues of fact and law raised hereby are referred to the Special Master appointed this date in accordance with a separate order to that end; and it is

FURTHER ORDERED, *sua sponte*, that Microsoft Corporation, its officers, agents, servants, employees, attorneys, and all others in active concert or participation with them, are hereby enjoined, and shall cease and desist from and after the date hereof, from the practice of licensing the use of any Microsoft personal computer operating system software (including Windows 95 or any successor version thereof) on the condition, express or implied, that the license also license and preinstall any Microsoft Internet browser software (including Internet Explorer 3.0, 4.0, or any successor versions thereof) pending further order of Court.

### ORDER OF REFERENCE TO SPECIAL MASTER

For the purpose of implementing the Memorandum and Order of even date herewith, it appearing to the Court that exceptional conditions of urgency are present, and that it is in the interest of justice to resolve as expeditiously as possible the complex issues of cybertechnology and contract interpretation connected therewith, it is, this 11th day of December, 1997.

ORDERED, that Lawrence Lessig, Esq., a member of the bar of the State of Illinois, whose *curriculum vitae* is attached hereto, is hereby appointed a Special Master pursuant to Fed.R.Civ.P. 53; and it is

FURTHER ORDERED, that Lawrence Lessig is admitted *pro hac vice* to the bar of this court; and it is

FURTHER ORDERED, that the Special Master shall receive evidence and legal authority presented by the parties at such times and places, and in such manner as he shall prescribe, and shall propose findings of fact and conclusions of law for consideration

by the Court on the issue raised by this case; and it is

FURTHER ORDERED, that, in the execution of this reference the Special Master shall possess and may exercise all powers conferred upon special masters in like cases; shall likewise possess and may exercise, to the extent permitted by law, all powers conferred upon U.S. Magistrate Judges by 28 U.S.C. § 636; and may make such orders as may be necessary and appropriate pursuant to the Federal Rules of Civil Procedure, all subject to review by the Court; and it is

FURTHER ORDERED, that the Special Master shall submit his Report, including his proposed findings of fact and conclusions of law, on or before May 31, 1998, whereupon this reference shall terminate, unless extended by further order of the court; and it is

FURTHER ORDERED, that the Special Master shall receive compensation for his services herein at the hourly rate of $250, and may employ a person of his choice in the capacity of a law clerk or research assistant; and it is

FURTHER ORDERED, that the Special Master's fee shall be assessed or apportioned as justice may require at the termination of the reference, except that the Special Master may apply for interim compensation if the reference is extended; and it is

FURTHER ORDERED, that other costs incurred by the Special Master in connection with this reference shall be borne equally the parties, and their respective shares thereof promptly paid as the Special Master shall direct, subject to reassessment or reapportionment at the conclusion of the case.